## CUDAHY PACKING CO. v. UNITED STATES.

### No. 46421.

Court of Claims.

Jan. 5, 1948.

JONES, Chief Justice, dissenting.

Tracy W. Buckingham, of Chicago, Ill., for plaintiff.

Horace G. Marshall, of Chicago, Ill., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

LITTLETON, Judge.

Plaintiff sues to recover $1,211.91 under a purchase order contract entered into with defendant, acting through the officer of the Quartermaster General, War Department, at Chicago, Illinois, on November 20, 1942. The purchase order called for shipment by plaintiff of 12,000 dozen eggs, f. o. b., Washington Court House, Ohio, for delivery November 24, 1942, to the Sales Officer, Camp Forrest, Tennessee, at a unit price of $0.435 per dozen, or $5,220, with "official inspection at origin subject to veterinary inspection and acceptance at destination."

Plaintiff shipped the eggs on November 20, 1942, and the shipment arrived at Camp

Forrest November 23, 1942. Inspection of the eggs by the Post Veterinarian on that date showed that out of the 12,000 dozen eggs delivered 2,786 dozen were unfit for human consumption. Defendant's refusal to pay for this portion of the shipment gives rise to plaintiff's claim.

Based upon a stipulation of facts we have specially found that on November 23, 1942, defendant inspected the shipment of eggs and determined that 2,786 dozen thereof should be rejected as unacceptable, but that it did nothing to inform plaintiff that it was not accepting this portion of the shipment until January 27, 1943, when the receipt of a "Change Order A," reducing original purchase order from 12,000 dozen eggs to 9,214 dozen, gave plaintiff its first intimation that defendant had rejected 2,786 dozen of the shipment (finding 3). Plaintiff's claim that it was entitled to be paid for the entire shipment of eggs rests upon this unreasonable delay by defendant in giving plaintiff notice of its rejection of the 2,786 dozen; that defendant having failed to give plaintiff notice within a reasonable time after inspection that it was rejecting these 2,786 dozen eggs should be deemed to have accepted all of the eggs delivered and to be liable to plaintiff for the purchase price of the entire lot. Defendant's position is (1) that plaintiff was advised of defendant's rejection within a few days after the eggs were rejected, and (2) that, even if this be not true, because of certain language contained in Condition 4(c) of the Contract it was not required to give plaintiff more prompt notice than it did of the result of its inspection, in order to be relieved of any obligation to pay for the portion rejected. We find no basis in the facts of record for defendant's first point.

Condition 4 of the contract, entitled "Inspection," insofar as it is here pertinent, provides:

"(a) All material and workmanship shall be subject to inspection and test at all times and places and, when practicable, during manufacture. The Government shall have the right to reject articles which contain defective material or workmanship. Rejected articles shall be removed by and at the expense of the contractor promptly after notification of rejection."

"(c) Final inspection and acceptance of materials and finished articles will be made after delivery, unless otherwise stated. * * * Final inspection shall be conclusive, except as regards latent defects, fraud, or such gross mistakes as amount to fraud. Final inspection and acceptance or rejection of the materials or supplies shall be made as promptly as practicable, but failure to inspect and accept or reject materials or supplies shall not impose liability on the Government for such materials or supplies as are not in accordance with the specifications. * * *"

The plaintiff concedes that under the provisions of the contract pertaining to "inspection" defendant had the right to inspect the eggs following their delivery at Camp Forrest and to reject such of them as were found by the Post Veterinarian to be unfit for human consumption, and that "plaintiff could not legally dispute the accuracy of this inspection." Plaintiff contends, however, that in order to make rejection of the eggs effective as to plaintiff it was necessary for defendant to notify it of such rejection within a reasonable time after the inspection and rejection of the eggs in question actually occurred, notwithstanding anything provided in Condition 4 of the contract.

There appears to be no question but that defendant had the right to refuse to accept the 2,786 dozen eggs if it did so within a reasonable time. The Uniform Sales Act has been in effect for over twenty-five years, both in Illinois where the contract was made and in Tennessee where final inspection and acceptance or rejection was to take place. Section 47, Chapter 121½, Uniform Sales Act, Illinois Revised Statutes 1945, State Bar Association Edition, provides that "where goods are delivered to the buyer, which he has not previously examined, he is not deemed to have accepted them unless and until he has had a reasonable opportunity of examining them for the purpose of ascertaining whether they are in conformity with the contract." Section 48 provides, on the other hand, that "the buyer is deemed to have accepted the goods * * * when, after the lapse of a reasonable time, he retains the goods without intimating to the seller that he

has rejected them." And section 69, in providing for the remedies of a buyer for breach of warranty, states that "where the goods have been delivered to the buyer, he cannot rescind the sale if he knew of the breach of warranty when he accepted the goods, or if he fails to notify the seller within a reasonable time of the election to rescind * * *."

In the circumstances of this case we think the merit of plaintiff's claim is to be judged by this statutory rule and we conclude, both as a fact and as a matter of law, that defendant retained the 2,786 dozen eggs beyond a reasonable time without intimating to plaintiff that it had rejected them. The eggs were required to be shipped in a "Car to be initially iced to capacity at shipper's expense." · They were so shipped. They were a perishable commodity, obviously intended for current consumption by the troops at Camp Forrest. The contract lodged the manner of their inspection at destination and the question of their acceptance with a specialist, the Post Veterinarian. Unlike many articles of manufacture, the question of their acceptability did not involve an experimental use, or require an opportunity to see if the goods could be made to serve the purpose for which they were purchased. We assume that the inspection of perishable foodstuffs at Camp Forrest had been fairly well systematized and that as the inspection proceeded the choice between acceptance and rejection of the individual items would be made with finality and dispatch. No reason appears why plaintiff should not have been informed of defendant's rejection of the eggs, found by the Post Veterinarian to be inedible, shortly after the shipment was inspected at Camp Forrest.

"Where goods have been received by the buyer and retained by him without objection for a substantial period of time, it is generally a question of fact for the jury as to whether the time that has elapsed before the complaint is made is a reasonable time, but where all reasonable minds would reach the conclusion that the goods were retained an unreasonable length of time before any complaint was made, it then becomes a question of law for the court.

Eureka Waist Co. v. Herrick Bros. & Co., 226 Ill.App. 316."

Defendant's principal contention is· that the Government should not be deemed to have accepted the rejected portion of the eggs, nor be required to pay for the entire shipment, because the duty arising under the Uniform Sales Act to give reasonable notice of rejection, and the liability attaching in the event goods are retained beyond a reasonable time without such notice, do not apply in the instant case. In support of this contention defendant points to section 71 of the Act providing that "Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale," and to that portion of Condition 4(c) of the cntract which states that "failure to inspect and accept or reject materials or supplies shall not impose liability on the Government for such materials or supplies as are not in accordance with the specifications."

Defendant views this language as an express negation of any right on the part of plaintiff to treat the 2,786 dozen defective eggs as having been accepted by defendant, based upon defendant's retention of such eggs for more than two months after final inspection without intimating to plaintiff that it had rejected them as not in accordance with the specifications. Under this contention it is necessary to read the words "failure to inspect and accept or reject" as "failure to inspect or to accept or reject," and to construe the entire provision as a waiver of any right to hold defendant liable based upon the Government's unreasonable delay either in inspection or in giving notice of rejection. Defendant's reasoning is that since a delay in inspecton would necessarily be accompanied by a consequent postponement of time when acceptance or rejection would be made and a notice thereof given to plaintiff, the latter can be placed in no worse position by a delay solely in receiving notice of an earlier rejection; that consequently it must have been intended by the language of Con-

dition 4(c) that no liability would accrue to defendant for a delay in giving notice of rejection, regardless of whether or not an undue interval of time occurred between the date of inspection and the date on which plaintiff was notified of the rejection.

We find no warrant for such construction of the contract provision. The normal obligation resting upon a buyer to exercise reasonable diligence in examining goods upon their arrival is separate and distinct from his further obligation to notify the seller within a reasonable time in the event the goods are rejected as a result of the examination. With respect to the first-mentioned obligation, Section 47 of the Uniform Sales Act provides, as we have noted, that where goods are delivered to the buyer which he has not previously examined, he is not to be deemed to have accepted them unless and until he has had a reasonable opportunity of examining them for the purpose of ascertaining whether they conform to the contract. Under this language there is a positive duty on the part of the buyer to inspect the goods without unreasonable delay, upon penalty of having the property in the goods otherwise pass to him; and this without regard to whether the seller may or may not have reason to believe the buyer had done nothing to ascertain whether the goods meet the contract requirements. Under like penalty section 48 makes it the duty of the buyer to refrain from such conduct as would indicate to the seller that the buyer had accepted the goods. It is possible that failure to fulfill the duty imposed by section 47, might result in the very situation proscribed by section 48, but this does not make the measure of the seller's rights under the one the measure of his rights under the other, nor a waiver by the buyer of whatever rights he may enjoy under section 47, a waiver of all his rights under 48.

The normal intention expressed in the words used by the parties in 4(c) of their contract is that the Government shall not be deemed to have accepted the property in such of the eggs delivered at Camp Forrest as may, upon inspection, be found to have failed to conform to the specifications when the eggs arrived at their destination, solely because the Government shall have failed to fulfill the duty which would otherwise be placed upon it by section 47 of the Uniform Sales Act; or shall have found it inexpedient to adhere to the time schedule for inspection which the parties must have contemplated when they prefaced the words "but failure to inspect and accept or reject," etc., with the statement that "Final inspection and acceptance or rejection of materials or supplies shall be made as promptly as practicable." We cannot believe the parties were thinking in the disjunctive sense, when twice in the same sentence they spoke of inspection and acceptance or rejection. It is more reasonable to believe that the defendant had in mind merely providing itself with ample leeway as to when it should make the final inspection and either accept or reject the eggs.

On occasions courts have found justification for either disregarding a particular word or substituting another where such is necessary to carry out the true intent of the parties. But this does not mean that the court may substitute "and" for "or," or vice versa, in order to give preference to one of two possible intentions, where the intention of the parties to use the connective word actually employed is apparent from other portions of the contract. See Dumont v. United States, 98 U.S. 142, 25 L.Ed. 65. In this case the face of the purchase order gives no basis for belief that defendant was making provision in the contract for the inspection by the Camp Forrest Post Veterinarian, and for the acceptance or rejection of the eggs which would follow, as disjointed or unrelated acts. The contracting officer's words were "Official inspection at origin subject to veterinary inspection and acceptance at destination." The purpose of the inspection was to ascertain whether the eggs should be accepted or rejected. One thought was to be accomplished. The Government was or was not to take title to the eggs, depending upon whether or not the inspection showed the eggs met the contract requirements. This same thought was present when, in Condition 4(c) the Government reserved the right to suit its own convenience as to the time when it should carry out this objective.

We think it would do violence to the fair intent of the parties, to construe the language of 4(c) as reserving to the Government the additional right to take its own time in notifying plaintiff of its electon to accept or reject the eggs once the inspection was accomplished.

■ Defendant suggests that because plaintiff has failed to offer any proof as to the value of the eggs in the condition in which the defendant found them on final inspection, the court might be justified in finding that the rejected eggs had no value, and that the delay in giving notice of rejection was therefore of no consequence since plaintiff could have suffered no damage. There are several answers to this. In the first place we could not expect plaintiff to offer much proof as to the value of the rejected eggs on November 23, when it had no knowledge until several months later that the eggs had not long since been consumed by the troops at Camp Forrest. Secondly, it is not our understanding that because the parties may have agreed in their contract that the Post Veterinarian's finding as to the unwholesome condition of the eggs for the purpose of use by the Army and that such finding should be conclusive upon plaintiff for the purposes of the sale of the eggs to the Army, this would make such finding conclusive for all purposes. The stipulation (finding 2), as we interpret it, states the fact to be that the Post Veterinarian's inspection disclosed only that the eggs were unfit for consumption by the soldiers at Camp Forrest under the Army's inspection standards. Moreover, Paragraphs 4(a) and (b) of the specifications provided for preliminary inspection of the eggs before shipment. Plaintiff says, and it is not denied, that the eggs were inspected and released by trained Government inspectors prior to shipment from Washington Court House, Ohio, on November 20. There may have been and probably were other channels in which plaintiff could have sold the eggs. And lastly, if the requirement of reasonable notice provided by the Uniform Sales Act is to serve as more than a starting point for argument the court should not be required to speculate as to what possible detriment the seller may have incurred through a failure to receive such notice. Under the circumstances of this case there is no more occasion for inquiring into what damage plaintiff may actually have incurred as a result of the unreasonable lapse of time between inspection and notice of rejection than there would be for requiring such evidence in connection with a breach of a contract provision for liquidated damages. When the property in the goods is deemed to have passed to the buyer in accordance with the applicable provisions of the Uniform Sales Act, and the buyer wrongfully neglects or refuses to pay for the goods according to the terms of the contract or the sale, under section 63 of the Act, the seller may maintain an action against him for the price of the goods.

■ It is necessary to say only a few words with reference to defendant's initial contention that plaintiff was notified of defendant's rejection of a part of the shipment of eggs within a few days after the eggs were inspected. We have found no evidence to support a finding to that effect. The case has been submitted upon a stipulation of facts in which the time when plaintiff first received notice, to wit, on January 27, 1943, did not appear to be in issue. However, the defendant in its request for special findings asks that we include in our finding with reference to the Post Veterinarian's inspection and rejection on November 23, 1942, of a part of the shipment of eggs delivered, a further finding that "plaintiff was notified of this fact within a few days thereafter." The sole support for this requested finding is the letter dated February 6, 1943, exhibit D (finding 5), wherein one A. E. Woolsey (whose official capacity is not disclosed), writing to plaintiff on the letterhead of the "Field Headquarters" of the "Office of the Quartermaster General" at Chicago, Illinois, with reference to a letter from plaintiff dated January 28, 1943, to Contracting Officer Captain E. C. Voll, stated as follows:

"Reference your letter of January 28, attention of Captain Voll, on Purchase Order FH 24362. The writer has checked this matter, and our file shows very plainly that you were notified of the transaction at the time the complaint was made. In fact,

the car was held down there five days, and we assumed the demurrage on it.

"We are inclosing a copy of Camp Forrest's letter on the subject, which is self-explanatory."

In view of the other convincing facts of record this letter, without more, would not constitute convincing proof of the fact that plaintiff had received notice of rejection prior to January 27, 1943, even if it had so stated, but a reading of the letter shows that all that it purported to say was that the "file" showed that at the time plaintiff's letter of January 28 was written, which was referred to a "complaint," plaintiff had been notified of the transaction, namely, the inspection and rejection. That was true, and the notice to which Woolsey referred was obviously Change Order A, which the proof here shows, and which his "file" doubtless also showed, had been mailed to plaintiff shortly before January 27, 1943, because it was received on that date. The "Camp Forrest's letter" referred to and enclosed by Woolsey was a letter bearing the date "December 15, 1942," addressed to the contracting officer at Chicago, from Captain Willis H. Hensley, Chief of Subsistence Branch at Camp Forrest, Tennessee, advising in part that "out of the 12,000 dozen eggs received 2,786 dozen were unfit for human consumption." There is no claim, however, that plaintiff had theretofore been advised of the contents of this letter.

The contents of the Woolsey letter of February 6, would seem to indicate that plaintiff's letter of January 28, written by a Mr. Sears, of the Egg Department of plaintiff corporation (who, apparently, had not seen Change Order A, received in plaintiff's office the day before), was in the nature of a complaint that no notice concerning the shipment of eggs had been given by defendant. Rather than evidencing the fact that notice of partial rejection had been given plaintiff within a few days after November 23, 1942, the Woolsey letter of February 6, 1943, tends to support plaintiff's contention and the other record facts that no such notice had been given prior to January 27, 1943.

Defendant's final point is that plaintiff is precluded from recovering because of its failure to appeal to the head of the department from the contracting officer's action in signing "Change Order A," which plaintiff received on January 27, 1943, as its first intimation that all of the 12,000 dozen eggs delivered to Camp Forrest had not been accepted. Defendant would have us treat this document as actually reducing the number of eggs called for under the contract from 12,000 dozen to 9,214 dozen, and as reducing the contract price from $5,220 to $4,008.09. It did neither, notwithstanding it may have purported to do so on its face. It presented no dispute concerning a question of fact such as was contemplated by paragraph 11 of the contract conditions.

Plaintiff is entitled to recover $1,211.91, and judgment will be entered in its favor for that amount. It is so ordered.

WHITAKER, MADDEN, and HOWELL, Judges, concur.

JONES, Chief Justice (dissenting).

I dissent. The contract clearly and specifically lodges in the Post Inspector the right to reject any part of the shipment which he found unfit for human consumption, and makes his judgment final.

It is true that plaintiff was not notified of the rejection within a reasonable time. Such failure, however, did not improve the quality of the rejected eggs.

I would allow plaintiff to recover only such salvage value, if any, as it has shown or can show would have been available to it had notice of rejection been given within a reasonable time. If plaintiff fails to make the necessary proof of such value I would find for the defendant.