**MAX BAUER MEAT PACKER, INC.**

v.

**The UNITED STATES.**

**No. 43–71.**

United States Court of Claims.

April 14, 1972.

A. Jay Cristol, Miami, Fla., attorney of record, for plaintiff. Cristol, Rose & Aldrich, Miami, Fla., of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and DAVIS, COLLINS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

COWEN, Chief Judge.

This Wunderlich Act case comes before the court on the parties' cross-motions for summary judgment. It was first presented to the Armed Services Board of Contract Appeals, which granted plaintiff partial recovery. 69–2 BCA ¶7870. Unsatisfied, plaintiff filed suit here to recover the rest of its claim, only to find the Government asserting that plaintiff is entitled to nothing and that the Board's award of partial relief should be reversed. *Cf.* S & E Contractors v. United States, 433 F.2d 1373, 193 Ct.Cl. 335 (1970), cert. granted, 402 U. S. 971, 91 S.Ct. 1659, 29 L.Ed. 135 (1971). We have carefully reviewed the administrative record, and upon consideration of the parties' briefs and their oral argument, we hold that the Board's decision is legally correct and that its findings are supported by substantial evidence.

The facts are set out in detail in the Board's decision and need be summarized only briefly here. Plaintiff, a meat-packing concern doing business in Miami, Florida, was awarded a contract by the Defense Supply Agency, Defense Personnel Support Center, to produce frozen pork roasts. The contract provided, *inter alia*, that the meat must be formed into roasts within six hours after boning, and that "the finished product shall be placed in a sharp freezer or wind tunnel with an ambient temperature of no higher than 0° F. within one hour after forming." The contract further provided for a verification inspection, which the Government conducted by examining twenty sample roasts from each day's production, the samples being

kept under refrigeration at temperatures slightly above freezing. According to the military specifications then in effect, if more than three of the twenty sample roasts have any surface fat exceeding $\frac{1}{4}$ inch, then the lot is unacceptable. Under plaintiff's contract, however, it had the right to rework a rejected lot to conform to the specifications, and to obtain a reinspection, either with or without reworking. But from a practical standpoint, plaintiff's rights to reworking and reinspection were limited by the fact that, as the parties stipulated before the Board, surface fat cannot be accurately measured once a roast has been blast frozen.

Since plaintiff's plant had no freezing facilities at the time the present dispute arose, roasts ready for freezing were taken to Zero Food Storage Company, located about nine miles away. By its usual practice, plaintiff would wait until it had produced enough roasts to make a truckload, and then ship them to Zero. This usually occurred twice a day, so that part of each day's production was placed in the freezer at about noon, while the rest went into the freezer at about 6:00 p.m.

The present dispute arose out of the Government's rejection of roasts produced on February 6, 1968. The verification inspection conducted that day revealed, according to the inspectors' conclusions, that seven of the twenty sample roasts had surface fat exceeding $\frac{1}{4}$ inch. Although cause for rejection, this was a minor, correctable defect, and under the contract plaintiff had the right to obtain a reinspection and/or rework the rejected lot. However, by the time the opportunity to do so actually arose in this case, the roasts were too far frozen to permit either reworking or reinspection.

The sequence and timing of the events of February 6 are important in resolving the issues in this case. According to the Board, plaintiff delivered the morning production to Zero at about noon that day, and delivered the afternoon production at about 6:00 p.m. The verification inspection began at about 6:15 p.m. It was conducted according to a formal "Plan for the Inspection Job," or "PIJ," signed by plaintiff, which set out the procedures for inspection and acceptance. The only persons present at the inspection were Sergeant Malone, a newly trained meat inspector, and Dr. Cheney, a Captain in the Air Force Veterinary Corps. Sergeant Malone, who performed the tests at the inspection, had never previously performed verification testing, although he had accompanied inspectors on other verification inspections.

The inspection was concluded at 7:30 p.m., approximately 90 minutes after the afternoon shipment had been placed in the freezer. The results were promptly forwarded by telephone to the New Orleans Market Center, with a recommendation that the lot be provisionally rejected for excessive surface fat, subject to reworking and reinspection. However, Captain Cheney did not receive authorization to reject until 10:10 p.m., when a Major Jackson in New Orleans instructed him to issue a flat rejection rather than the provisional rejection contemplated by the specifications and the PIJ. Captain Cheney subsequently notified plaintiff of a flat rejection at 10:20 p.m.

About midnight, Major Jackson realized that a flat rejection might have been in derogation of plaintiff's rights to reinspection and reworking, so he forwarded instructions to Captain Cheney to return to Zero and check the roasts. Captain Cheney and Sergeant Malone met with plaintiff's plant manager and its attorney at Zero at 1:20 a. m., where they concluded that the roasts were too far frozen to permit reworking or reinspection. Plaintiff subsequently sold the roasts commercially, in mitigation of damages, and sustained a loss of $4,098.81.

Plaintiff's appeal to the ASBCA presented two broad issues: First, whether the verification inspection was factually in error; and second, whether plaintiff was deprived of its rights to reinspection and reworking by the inspection plan and/or by the Govern-

ment's delay in giving notice of rejection. For convenience, we shall discuss the latter issue first.

■ As to that portion of the rejected lot which was placed in the freezer at noon on February 6, plaintiff argued to the Board that plaintiff had no opportunity to exercise its contractual rights to reworking and reinspection because the morning production was already frozen by the time of the inspection, and therefore, that reworking and/or reinspection were impossible. The Board held that plaintiff had in fact agreed to the inspection plan and that it could not complain that the plan necessarily prejudiced its contract rights. We think this finding is supported by substantial evidence. The Board found that plaintiff had failed to prove its argument that the Government had denied its request for a split-lot inspection, which would have alleviated plaintiff's predicament. Instead, the Board intimated that the whole-lot inspection plan in fact had been arranged for plaintiff's convenience as an accommodation. Thus the Board noted testimony to the effect that plaintiff had actually requested whole-lot inspection to avoid the additional paperwork and inconvenience resulting from two daily inspections rather than only one. Moreover, on the day after the rejection the inspection plan was altered, at plaintiff's request, to provide for split-lot inspection.

Plaintiff attacks the Board's finding that it had "agreed" to the inspection plan, by the contention that the contract provides that determination of the time, manner, and place of inspection is the prerogative of the Government. It submits that, under the contract, it had no choice but to agree to an inspection plan which denied it its contract rights. We might be inclined to agree with such a contention where the facts indicate, for example, that a contractor is forced to submit to an inspection procedure that is wholly unreasonable or which otherwise adversely affects his contractual rights. Cf. Adams v. United States, 358 F.2d 986, 175 Ct.Cl. 288 (1966). However, we cannot accept the argument here since, irrespective of the language of the contract, the facts indicate that plaintiff in fact agreed to the inspection plan without reservation.

As to that portion of the rejected lot which was placed in the freezer just prior to the inspection, the Board took a different course. This shipment was not frozen by the time the inspection was completed. The Board noted that ice crystals would not begin to form on the roasts until about two hours after having been placed in the freezer, some thirty minutes after completion of the inspection involved here. Thus, if plaintiff had been immediately informed of a provisional rejection, it could have removed the shipment from the freezer for reworking and/or reinspection.

■ The Board found that the Government had unreasonably delayed in issuing its rejection, and that but for the delay, plaintiff would have had the opportunity to rework and resubmit the afternoon portion of the rejected lot. On this basis, the Board held that the Government's failure to reject in a timely fashion constituted an acceptance, and that the Government was therefore liable for plaintiff's loss on the afternoon production.

We agree. We have held that the Government will be deemed to have accepted a tendered delivery where it fails to reject within a reasonable time. Cudahy Packing Co. v. United States, 75 F.Supp. 239, 109 Ct.Cl. 833 (1948). See also Uniform Commercial Code § 2–602(1). What constitutes a reasonable time depends, of course, upon the circumstances. Here, had the Government not delayed in issuing its rejection, plaintiff would have had the opportunity to exercise its rights to reworking and reinspection. We agree with the Board that the delay here was unreasonable.

The Government contests the Board's conclusion that plaintiff is entitled to even partial relief. Its three arguments are (1) that the inspection was of the

whole lot, which cannot be divided into a morning and an afternoon production; (2) that even if rejection had been prompt, plaintiff could not have reworked the afternoon production because all of its workers had gone home for the day, [however, plaintiff informed us at oral argument that it had a skeleton crew at its plant for precisely this purpose until it received notice of rejection at 10:20 p.m.]; and (3) that there is no valid basis for concluding that there were in fact two shipments on February 6, since the evidence indicates that there may have been three.

We cannot accept any of the Government's arguments. First, irrespective of whether the parties treated a whole day's production as a single lot, a vendee can still accept or reject only a part of a lot. *See* Uniform Commercial Code § 2–601, and Comment No. 1 thereto. Second, whether or not plaintiff could have in fact reworked and resubmitted the afternoon portion is beside the point, since we have already held, as did the Board, that the Government's unreasonable delay in notifying the plaintiff constituted an acceptance of the afternoon production by the time plaintiff's opportunity to rework actually arose. Moreover, we note that, in addition to its right to rework, plaintiff also had the right to demand reinspection without first reworking the rejected products. Thus, if the Government had promptly conveyed its rejection, plaintiff could have obtained such a reinspection even if it did not have the capacity to rework and then resubmit. Third, we think that the Board was entitled to infer from plaintiff's usual practice that the rejected lot was transported to Zero in two rather than three shipments. Once the Board concluded that plaintiff was entitled to relief, it had to estimate the amount of recovery. We think that the Board's reliance on plaintiff's usual course of practice was proper for this purpose. *See, e.g.,* Electronic & Missile Facilities, Inc. v. United States, 416 F. 2d 1345, 1358, 189 Ct.Cl. 237, 257 (1969).

The other broad issue which plaintiff presented to the Board was whether the Government inspectors were in error in rejecting the lot for excessive surface fat. In a stipulation before the Board, the issue was framed as follows:

Was the surface fat thickness of the samples taken for verification testing by the Government inspectors in fact within the allowable thickness under the contract specifications?

Plaintiff is in a particularly difficult position regarding this issue, since none of its employees was present at the inspection. Before the Board, plaintiff argued that the inspection was tainted for three specific reasons: First, that Sergeant Malone, who actually performed the verification tests, was too inexperienced; second, that Sergeant Malone's use of a sharpened ruler in cutting the fat was improper because a ruler tends to distort fat thickness; and third, that Sergeant Malone was overzealous in that he made an excessive number of cuts into the samples, thereby destroying the statistical validity of the inspection.

As the Board characterized the issue, and properly so in light of the parties' stipulation, the only question before it was whether plaintiff had proved that "the Government's inspection methods [and Sergeant Malone's inexperience] produced an incorrect result." 69–2 BCA at 36,574. This is a question of fact, and we cannot overturn the Board's findings on this issue unless they are not supported by substantial evidence.

In detail, the Board discussed Sergeant Malone's general qualifications as well as his ability to properly measure fat thickness. A demonstration inspection was conducted at the trial, at which the Board members present personally observed the techniques which Sergeant Malone used in conducting the February 6 inspection. His techniques were the same as those demonstrated by Sergeant Forsyth, another Government inspector, whom plaintiff acknowledged to be high-

ly qualified. In addition, there was ample testimony in the record that, under actual testing conditions, a sharpened ruler is not an improper instrument for cutting fat. We think there was substantial evidence to support the Board's ultimate finding that plaintiff had not established that the Government inspectors incorrectly concluded that the sample roasts had excessive surface fat.

Plaintiff's motion for summary judgment is denied and its petition is dismissed. Defendant's motion for summary judgment is granted. However, defendant's "cross appeal" for denial of the recovery allowed by the Board is dismissed.