Per Curiam:
Plaintiff, a Massachusetts Corporation, brought this suit pursuant to House Resolution No. 423, 87th Congress, 1st Sess. (1962), which referred H.R. 8585 (a bill for plaintiff’s relief) to this court in accordance with 28 U.S.C. §§ 1492 and 2509.[1]
Plaintiff, a construction company, was the successful bidder on Contract No. DA-19-016-ENG-5926, dated May 31, 1958. This contract was for the construction of family housing, site work and utilities, at the Otis Air Force Base, Falmouth, Massachusetts. The project covered an area of. approximately 200 acres and consisted of 175 buildings, 72 of which were single family units and 416 row-type units, for a total of 488 housing units. Included in the project were new roads, walks, driveways, carports, and electrical and water distribution systems, and landscaping. During the course of the performance under the contract, directives were issued by the contracting officer requiring that plaintiff perform certain work which the contracting officer considered to be within the terms of the contract but which plaintiff regarded as being beyond the contract requirements. Administrative proceedings were instituted and subsequently suspended when, in the view of the parties, neither the Corps of Engineers Board of Contract Appeals nor the contracting officer had funds available to make payment to the plaintiff. *650 The parties thereupon entered into a stipulation, providing, in part, that the Government, while admitting the 10 claims of the plaintiff had merit, did not agree to the dollar amount of the claims. At the trial in this court, the parties stipulated that the amount due plaintiff, in the event there is an equitable right to recover, is the sum of $110,000.
The case is before the court, having been submitted on a report of the trial commissioner, to which defendant filed exceptions, the briefs of the parties, and oral argument of counsel. It is concluded that plaintiff is entitled to recover on its equitable claim in the amount of $110,000 in accordance with the stipulation entered into by the parties.
Defendant’s motion to dismiss for lack of jurisdiction, filed July 14,1964, is denied.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Representatives pursuant to H.R. No. 423, 87th Congress, 1st Session.
EINDINGS OK FACT
The court, having considered the evidence, the report of Trial Commissioner Herbert N. Maletz, and the briefs and argument of counsel, makes findings of facts as follows:
1. Plaintiff is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts with its principal office in Cambridge, Massachusetts. It is engaged in general contracting work and has been in that business for about 47 years.
2. (a) This matter was referred to the court by House Resolution 428 which was agreed to by the U.S. Plouse of Representatives on June 5,1962. That Resolution provided:
Resolved, That the bill (H.R. 8585) entitled “A bill for the relief of Jefferson Construction Company”, together with all accompanying papers, is hereby referred to the Court of Claims subject to its rules and pursuant to sections 1492 and 2509 of title 28, United States Code; and the court shall proceed expeditiously with the same and report to the House, at the earliest practicable date, such findings of fact, including facts relating to delay or laches, facts bearing upon the question whether the *651 bar or any statute of limitations should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy, and conclusions based on such facts as shall be sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.
(b) The referred bill (H.R. 8585, 87th Congress, 1st Session) provided in part:
A BILL
For the relief of the Jefferson Construction Company.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the Jefferson Construction Company, of Cambridge, Massachusetts, the sum of $160,166. The payment of such sum shall be in full settlement of all claims of the said Jefferson Construction Company against the United States arising out of extra work orders involving removal and replacement of clapboards, removing and replacing twisted and bowed framing members, installing pressure treated two-by-four blocking at party walls, furnishing and installing two-inch-wide joint reinforcing in cavity block walls, lack of partial access to site due to barricades placed in road, work required to be done because of direction to use and countersink fivepenny box nails, installing construction joints in the foundations of ninety-one row house buildings, filling nail depressions in sheetrock, raising floor girts and installing shims and quarter-inch-round shoe molding, covering beams and boxing in heating pipes, made oy the contracting officer, Corps of Engineers, Department of the Army, in the course of performance by the said Jefferson Construction Company of contract numbered DA-19-016-ENC-5926, dated May 31, 1958, for the construction of family housing units site-work and utilities at Otis Air Force Base, Falmouth, Massachusetts, for which payment has not been made because sufficient funds are not available therefor to the Department of the Army: * * *
3. Plaintiff filed its petition in this court under the above reference on June 27,1962.
*652 4. On April 29,1958, the Army Corps of Engineers issued invitations for 'bids for the construction of family housing, site work and utilities at the Otis Air Force Base, Falmouth, Massachusetts. The project covered an area 'of approximately 200 acres and consisted of 175 buildings, 72 of which were single family units and 416 row-type units, for a total of 488 housing units. Included in the project were new roads, walks, driveways, carports, an electrical and water distribution system, and landscaping.
5. Plaintiff was the successful bidder and was awarded Contract No. DA-19-016-ENG-5926, dated May 31, 1958, for an original total estimated amount of $8,484,377, which was increased to $8,801,908.90 by 57 contract modifications that were made by the Corps of Engineers.
6. (a) Section 606 of the Department of Defense Appropriation Act, 1958, approved August 2, 1957 (71 Stat. 312, 323), provided as follows:
During the current fiscal year, appropriations otherwise available for construction of family quarters for personnel shall not be obligated for such construction at a cost per family unit in excess of $20,000 on housing units for generals or equivalent; $18,000 on housing units for colonels or equivalent; $16,000 on housing units for majors and lieutenant colonels, or equivalent; $14,000 on housing units for second lieutenants, lieutenants, captains, and warrant officers, or equivalent; or $12,000 on housing units for enlisted personnel, except that when such units are constructed outside the continental United States or in Alaska, the average cost per unit of all such units shall not exceed $25,850 and in no event shall the individual cost exceed $35,000, except units for the Alaska Communications System the individual cost of which shall not exceed $40,000.
• (b) Section 610 of the Military Construction Appropriation Act, 1959, approved August 28, 1958 (72 Stat. 1096, 1099), provided as follows:
During the current fiscal year, appropriations available for construction of family quarters for personnel shall not be obligated for such construction at a cost per family unit in excess of $22,000 on housing units for Generals or equivalent; $19,800 on housing units for Colonels or equivalent; $17,600 on housing units for *653 Majors and Lieutenant Colonels, or equivalent; $15,400 on bousing units for Second Lieutenants, Lieutenants, Captains and Warrant Officers, or equivalent; or $13,200 on bousing units for enlisted personnel, except that wben sucb units are constructed outside tbe continental United States or in Alaska, tbe average cost per unit of all sucb units shall not exceed $32,000 and in no event shall the individual cost exceed $40,000.
(c) Tbe contract specifications contained a statement that “Funds for this project are limited due to Congressional limitations * *
(d) At a meeting with plaintiff in August 1958 to consider substitutions and deletions of various items from the housing part of the contract, the Corps of Engineers discussed the Congressional limitation and indicated concern about exceeding it.
¡7. In its bid of $8,484,377, plaintiff allocated $6,397,704 for the construction of the 488 housing units, while the balance was allocated for site and other work outside the units.
8. (a) The 488 housing units consisted of 294 units for enlisted men, 122 units for lieutenants and captains, 67 for majors and lieutenant colonels, and 5 for colonels.
('b) Multiplication of the number of units by the maximum family cost per unit for each type of unit involved resulted in a total limitation of $6,398,000 under the Department of Defense Appropriation Act of 1958. The difference between that amount and plaintiff’s bid of $8,484,377 was attributable to utilities, site work and other operations which were not subject to the Congressional limitation.
.(c) At the time the Corps of Engineers accepted plaintiff’s 'bid, plaintiff’s total estimated cost of $6,397,704 for the 488 housing units was $296 less than the overall limitation of $6,398,000 under the Department of Defense Appropriation Act of 1958.
9. Plaintiff received an order to proceed on June 18,1958, and began actual construction on July 8,1958. The buildings were completed in March 1960 and the overall project was completed and accepted by the Government on June 17, 1960.
*654 10. In broad outline, the basis of the present proceeding is as follows:
Between September 1958 and September 1959, the Government contracting officer, on various occasions, issued directives to plaintiff requiring it to perform certain work which he considered within the terms of the contract, but which plaintiff regarded as beyond the contract requirements. A successor contracting officer found 10 of plaintiff’s claims, which are the subject of the present suit, meritorious, i.e., without the terms of the contract, but ruled that no payment could be made to the company on the ground that available funds within the Congressional limitation had been exhausted. Plaintiff filed a timely appeal to the Corps of Engineers Board of Contract Appeals. The proceedings before that Board were suspended when, in the view of the parties, neither the Board nor the contracting officer had funds available to make payment to the plaintiff. The parties entered into a stipulation providing, in part, that the Government, while admitting the 10 claims had merit, did not agree to the dollar amount of the claims. The stipulation, therefore, provided that the parties agreed that a Congressional private relief bill may provide that the exact amount of the claims shall be ascertained by the United States Court of Claims.
11. Nine of the 10 claims involved in the present case arose in basically similar fashion in the following manner:
The contracting officer orally directed plaintiff to perform certain work (the nature of which is set forth in finding 12) without additional compensation since he considered it within the original contract specifications. Plaintiff protested that the directive called for work not required by the contract. Thereupon the contracting officer, acting through his representative, issued a written order requiring the work to be performed. The plaintiff complied with the written directive under protest and took timely written appeal to the contracting officer claiming that the work performed was extra work for which it was entitled to additional compensation.
12. The following chart sets forth the nature of the work that was thus performed by plaintiff in accordance with the *655 directive of the contracting officer’s representative and the date each claim arose:
Work performed by plaintiff in ac-
cordance with, directive of conflate claim arose tracting officer:
March 16, 1959. 1. Removal and replacement of clapboarding.
August 12, 1959. 2. Removing and replacing twisted and bowed framing members.
August 1959. 3. Installation of pressure-treated 2” x 4” blocking at party walls.
About April 9, 1959. 4. Furnishing and installing 2" wide joint reinforcing in the masonry concrete block cavity walls.
September 1958. 5. Use of 5d galvanized box nails and countersinking these nails.
January 27, 1959. 6. Installation of construction joints in the foundation.
Claim first arose about December 12, 1958 and continued throughout the job. 7. Filling the nail depressions of the sheetrock work.
August 1959. 8. Raising of the floor girts and installing filler pieces between the lally column head plates and installation of % round shoe moulding.
Approximately August or September 1959. 9. Covering of beams and the boxing in of heated pipes.
13. The tenth claim involved in the present suit arose as a result of the Base Police at the Otis Air Force Base, on July 24, 1959, erroneously barricading a road within the limits of the Base customarily used by a large number of plaintiff’s workmen.
14. (a) Plaintiff submitted a formal claim for compensation as to each of these ten claims within thirty to sixty days after the claim first arose.
(b) The contracting officer’s representative requested plaintiff to withdraw various claims it had filed. Plaintiff did not accede to these requests.
' 15. The percentage of overall completion of the project in dollar amount in December 1958 was about 15% and when the last claim arose, it was about 70%.
16. The ten claims involved work which related only to some of the 488 units involved in the project.
*656 17. (a) Plaintiff had no way of determining at the time the extra work orders were issued what effect, if any, they would have on the cost per unit. This was because the Corps of Engineers was considering at the time proposals for additions and deletions to the work, and at no time did plaintiff know how much work the Corps of Engineers might add or delete.
(b) As set forth in finding 5, there were 57 modifications of the contract made 'by the Corps of Engineers. These modifications both added to and deducted from the work. For that reason, although at the time of acceptance of plaintiff’s bid, its estimated cost for the 488 imits was $296 less than the overall limitation imposed by the Defense Appropriation A.ct of 1958 (see finding 8 (c)), that figure did not remain constant.
(c) The Government has admitted that at the time the contracting officer issued the extra work orders, plaintiff had no way of knowing that the extra work orders would cause the cost per unit to exceed the Congressional limitation.
tl8. On three or four occasions in the spring of 1959, the contracting officer suggested to plaintiff that unless the latter carried out his directives to perform the work involved here (which he regarded as within the terms of the contract), he would consider terminating the contract for default.
;19. The Corps of Engineers interpreted the Congressional limitation to be not a limit on the cost of each unit, but rather a limitation on the overall cost of the entire project of 488 units, which was to be determined by the number and types of housing units specified in the contract. Under this interpretation, the Corps of Engineers could theoretically spend $20,000, for example, on one particular airman’s unit so long as it maintained an overall average within the limitation.
20. In consequence of this interpretation of the statute, the Corps of Engineers kept no accounts or records to show the cost of each unit.
21. (a) The Corps of Engineers usually sets up a small contingency fund to provide for extra work to protect itself during the course of a project with respect to claims which may exceed the Congressional limitation. Neither when the *657 contracting officer issued the directives Which, plaintiff protested, nor when plaintiff filed the claims, did the Corps of Engineers set up any contingency or reserve fund to provide for plaintiff’s claims if they were found to have merit.
(b) The contracting officer could not legally set up a contingency or reserve fund which would provide for spending in excess of the statutory cost limitations for the housing units.
22. After plaintiff filed timely claims with the contracting officer, plaintiff requested him to issue contracting officer’s decisions concerning the claims. The contracting officer refused to do so. He told the plaintiff there was no need for decisions on the ground that the directives he had issued did not call for extra work, but rather required work within the terms of the contract.
23. Plaintiff had about 10 meetings with representatives of the Corps of Engineers in an effort to resolve the claims- by the issuance 'by the Government of modification or change orders. This was done by plaintiff to avoid the necessity of obtaining adverse contracting officer’s decisions and then having to resort to the appeal procedure.
24. Lt. Colonel Nicholas A. Lord was the contracting officer from July 1958 to August 15, 1959, When he was succeeded by Major Eichard Erlenkotter. The latter served as contracting officer until December 28, 1959, when he was succeeded by Philip Thoresen, Chief of Construction in the Providence Area Office of the Corps of Engineers. Mr. Thoresen continued as contracting officer until July 25,1960, When he was succeeded 'by Lt. Colonel Albert E. Saari.
25. On December 17,1959, plaintiff, at a meeting with representatives of the Corps of Engineers, requested that the Corps advise it 'as to the status of the Government’s account for the job. Corps personnel were unable to provide this information. At this same meeting plaintiff had a discussion with Major Erlenkotter, who was then serving as contracting officer, about resolution of its claims. Major Erlen-kotter said that he had not had time to review the claims that had been filed with his predecessor but that as soon as he could get to them, he would issue contracting officer’s decisions.
*658 26. Mr. Thoresen, who became contracting officer on December 28, 1959, decided in March 1960 to obtain an impartial expert to evaluate the claims from a technical standpoint. The expert filed an extensive report recommending that the Corps of Engineers re-study the claims.
27. Partly as a result of the expert’s report, the contracting officer issued favorable decisions on the 10 claims on June 13,15, 20, and 21, 1960, and September 7 and 14, 1960. The contracting officer fomid that each of the 10 claims contained merit; that plaintiff’s position on each was reasonable under the circumstances; and that plaintiff was entitled to additional compensation. However, the contracting officer held in each case that by virtue of the Congressional limitation stemming from the Military Construction Appropriation Act of 1959, he had “no 'authority to make payments under [the] contract for work performed upon or related to the housing units, which exceeds the fixed monetary limits.” For this reason he denied payment of all the claims.
28. As set forth in finding 9, the buildings were completed in March 1960, and the overall project was completed and accepted in June 1960. By June 1960, when the contracting officer issued the first series of decisions, the Corps of Engineers had exhausted its overall appropriation of $8,801,908.90 except for the sum of $100.
29. The contracting officer unreasonably delayed issuing contracting officer’s decisions. If the claims had been resolved by the contracting officer with reasonable expedition, the contract would then have been at a stage of performance Where sufficient funds would have been available to make payment. The contracting officer could have either issued prompt decisions or established a contingency fund to cover the claims until they were resolved, and, if necessary, to avoid exceeding the Congressional limitation deleted other work.
30. In mid-summer of 1960, plaintiff discussed the claims with General Potter, District Division Engineer, and General Potter stated that the claims had merit and should be paid but that the Government didn’t have the money.
*659 31. Plaintiff took timely appeals from the contracting officer’s decisions to the Corps of Engineers Board of Contract Appeals.
32. The Government moved to dismiss the appeals on the ground that the payment of the claims could not ’be made by the contracting officer because such amount would exceed the Congressional limitation for the project.
33. The Corps of Engineers Board of Contract Appeals denied the Government’s motion to dismiss. The Board was of the view that the limitation was on the cost per unit, and not on the overall project. It concluded that:
* * * the appellant is not ¡barred per se from asserting his claims as to each structure merely by the fact that the sum of all the unit limitations will be exceeded in the event of allowances on individual claims. What remains to be shown is that in each instance the unit cost will be exceeded on the particular structure by allowing the additional compensation admittedly owed by the Government for extra work performed on that particular unit.
34. (a) The Government was unable to prove the cost per unit.
(b) The Government, admitted it was impossible to prove the cost per unit and the effect the claims would 'have on the cost per unit.
35. Nevertheless the Corps of Engineers had no funds to pay the claims. Accordingly, on July 6, 1961, the parties filed the following stipulation with the Board on the basis of which the Board ordered further proceedings suspended:
STIPULATION
Now come the appellant, Jefferson Construction Co., by its counsel, Philip M. Cronin, and the United States Army Engineer Division, New England, by the Government trial attorney, Frank Y. Bonzagni, and represent as follows:
Whereas, Jefferson Construction Co. has filed ten claims with the Contracting Officer under Contract No. DA-19-016-ENG-5926, dated May 31, 1958; and
Whereas, the Successor Contracting Officer ruled that each of the claims has merit, but was unable to pay such claims because of a Congressional limitation, Public *660 Law 85-852, Military 'Construction Appropriaiton Act, 1959, 72 Stat. 1096 at page 1099, Title VI, General Provisions, Section 610; and
Whereas, appellant took timely appeals to the Chief of Engineers of the Department of the Army and the Corps of Engineers Board of Contract Appeals; and
Whereas, the Government moved to dismiss the claims on the ground that if any amount is found due appellant, payment could not be made because such amount would exceed the Congressional limitation for the project set out in Department of Defense Appropriation Act, 1958, Public Law 117, 85th Congress, 1st Session, Title YI, Section 606,71 Stat. 312; ana
Whereas, appellant opposed the Government’s motion to dismiss on the grounds, among others, that the aforesaid limitation was a limitation on cost per family unit and not a limitation on the project; and
Whereas, the Board of Contract Appeals, on March 31, 1961, in a written opinion denied the Government’s ■preliminary motion to dismiss on the grounds that the Congressional limitation is a limitation on the unit cost and not the over-all cost; and
Whereas, even if the Board of Contract Appeals remanded the appeals to the Contracting Officer, the Contracting Officer could not make payment because he feels such payment would exceed the Congressional limitation; and
Whereas, at a pre-hearing conference on May 9 and 10, 1961, before the Board of Contract Appeals, the Board ox Contract Appeals and the parties agreed that ■the proceedings before the Board be 'held in abeyance until Congress could act on a private relief bill;
Now, therefore, the parties agree and stipulate as follows :
1. Jefferson Construction Co., hereinafter called appellant, secured a contract with the United States Army Engineer Division, New England, Corps of Engineers, Contract No. DA-19-016-ENG-5926, dated May 31, 1958 for the Construction of 488 Family Housing Units, Site Work and Utilities at Otis Air Force Base, Fal-mouth, Massachusetts.
2. In the course of the aforementioned work, the Contracting Officer ordered appellant to perform certain work which appellant stated was not required by the contract, but was extra work, and filed ten timely claims for reimbursement.
3. A Successor Contracting Officer, on June 13,15, 20, and 21, 1960, and September 7 and 14, 1960, found that *661 each of the ten claims bad merit, but ruled' that he could not make payment because of the Congressional limitation previously described.
4. Appellant took timely appeal under Clause 6 of the contract to the Corps of Engineers Board of Contract Appeals.
5. The total estimated amount of the contract was $8,484,377 which was increased by 57 modifications to $8,801,908.90.
6. Payments were made during work totalling $8,801,-808.90, there being $100 retainage.
7. Government records were maintained to provide for payments within the statutory limits.
8. After appellant’s ten appeals were docketed with the Board of Contract Appeals, the Government, on December 27, 1960, filed a preliminary motion to dismiss on the grounds that if any amount is due appellant, payment may not be made by the Contracting Officer because such amount would exceed the Congressional limitation for the project in 71 Stat. 312.
9. Appellant opposed the Government’s preliminary motion to dismiss because the limitation was not a limitation on the project but a limitation on the cost per family unit.
10. The Board of Contract Appeals, by decision dated March 31, 1961, denied the Government’s, preliminary motion to dismiss on the grounds that the limitation was not on the over-all cost of the project, but on the cost of each unit. A copy of the opinion is attached to this stipulation.
11. At a pre-hearing conference on May 9 and 10,1961, the Government trial attorney for the U.S. Army Engineer Division, New England, represented to the Board that while the Government accepted a lump sum bid which was $296 less than the statutory limit of $6,398,-000, for that portion of the contract applicable to the Family Housing Units determined by multiplying the number of units by the statutory limit per type of unit, the Government estimate was based, nevertheless, on estimates of cost for each type of unit. In effecting payments, however, the Government maintained its accounts on the basis of the over-all project and not on a unit by unit basis. The appellant represents that he prepared his bid on the basis of over-all cost, not segregated as to cost of individual units.
12. Appellant, by filing his appeals, is seeking to exhaust his administrative remedies, but there appears to *662 be a serious question whether administrative relief is available, for even if the Board of Contract Appeals should find for the appellant, the Board does not have jurisdiction to order payment. It could remand the appeals to the Contracting Officer, but the Contracting Officer in good faith feels that even if the appeals are remanded, payment could not be made because such payment would exceed the Congressional limitations. Therefore, if appellant does exhaust its administrative remedies, it would appear that the only remedy available to the appellant may be enactment by Congress of a bill for private relief. Exhaustion of administrative remedies is not essential to Congressional relief and under the circumstances it would appear fruitless.
13. Appellant’s ten claims total $160,166. While the Government admits these claims have merit, it does not agree to the dollar value of the claims. The parties therefore agree that a Congressional private relief bill may provide that the exact amount of the claims shall be ascertained by the United States Court of Claims pursuant to 28 U.S.C.A., section 1492.
14. The parties agree that the appeals shall be removed from the docket and continued by the Board of Contract Appeals with the right of appellant to reinstate the appeals in the event that the private relief bill shall not afford appellant the relief sought.
15. Tins stipulation is entered without prejudice to either party and with the right reserved to reopen the proceedings before the Board of Contract Appeals at any time for any reason.
36. The Corps of Engineers agreed, following a meeting between General Potter, the Division Engineer, and plaintiff, that the Government would do all it could within the law to assist in the prosecution of plaintiff’s claim by doing what was equitable for the contractor. On the basis of this assurance, plaintiff withdrew another substantial claim involving this same project.
37. The claims involved here are not applicable to all the units but only to certain units or certain aspects of the work.
38. There is no evidence as to whether or not the allowance of these claims would cause the cost per unit where the extra work was done to exceed the Congressional limitation applicable to that type of unit.
*663 39. The Secretary of the Army, in a letter dated April 20, 1962 to the Chairman of the Committee on the Judiciary of the U.S. House of Eepresentatives, stated in part: “In view of the admitted merit of the company’s claims, the only issue in dispute being the amount, the Department favors the (House) resolution (423).”
40. At the trial the parties stipulated that the amount due plaintiff in the event that there is a legal or equitable right to recover is the sum of $110,000.
41. At the pretrial conference plaintiff conceded that absent Congressional action, it had no legal right to bring action directly in this court.

 Although the petition herein was filed after the Supreme Court’s ruling in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), the case was referred by the House of Representatives (on June 7, 1962) prior to that ruling and therefore, in accordance with its practice and procedure in such cases, the court is passing on the merits of the case.