**Herman ADAMS, doing business as Adams Manufacturing Company**

v.

**The UNITED STATES.**

**Cong. No. 5–59.**

United States Court of Claims.

April 15, 1966.

Dale L. Bumpers, Charleston, Ark., attorney of record, for plaintiff.

Charles A. Simmons and Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM: *

This is a suit for direct or primary loss in the amount of $172,081.92 caused by delays which occurred in the performance of a contract to produce a large number of wood tent pins for defendant. A claim for so-called "indirect loss" or secondary loss in the amount of $43,061.91 is not deemed to be supported by substantial evidence (and is no longer pressed by plaintiff). Extensive delay is attributed by plaintiff to the arbitrary and unreasonable action of an employee of defend-ant, Inspector Joseph C. Burkhart, in rejecting as many as 50 per cent of the tent pins produced by plaintiff under his inspection. There is also involved the withholding of information by defendant or failure of Inspector Burkhart to furnish plaintiff with the inspection plan which was used and the Acceptable Quality Level (AQL) required by defendant in performance of the contract. When Inspector Burkhart was replaced by another inspector (Kallen) the percentage of discarded or rejected pins was decreased from over 50 per cent under Inspector Burkhart to about 20 per cent or lower under Inspector Kallen. Although plaintiff did not exhaust his administrative remedies or file a formal complaint concerning the inspection of pins by Inspector Burkhart, he did make complaint and discuss his problems with Burkhart and Burkhart's supervisor.

By H.Res. 296, 86th Congress, 1st Sess., the House of Representatives has asked the court, pursuant to 28 U.S.C. §§ 1492 and 2509, for a report as to whether plaintiff is legally or equitably entitled to any damages in connection with a contract which he had with the defendant to manufacture tent pins.[1]

In response to a request for proposals issued by the Chicago, Illinois, Quartermaster Corps on November 14, 1953, plaintiff submitted a proposal to furnish quantities of 16-inch and 24-inch tent pins for a consideration of $103,177.26, f. o. b. certain destination points. Plaintiff initially computed his net direct material costs at $24,320.46, later increased to $50,140.

Upon opening the bids, defendant's contracting officer noted that plaintiff's material cost allocation was substantially

---

* This opinion incorporates, with some changes and added discussion, the opinion prepared, at the direction of the court under Rule 57(a), by Trial Commissioner Paul H. McMurray.

1. Since the case was referred to this court by the House of Representatives (on June 30, 1959) and the pleadings filed pre-cede the Supreme Court's decision in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S. Ct. 1459, 8 L.Ed.2d 671 (1962), the court deems it proper to pass on the merits of the case including its "equitable" aspects (see, e. g., Rocky River Co. v. United States, 169 Ct.Cl. 203 (1965); Jefferson Constr. Co. v. United States, 168 Ct. Cl. 648 (1964)).

lower than the second lowest bidder. A few weeks later a representative of the Chicago Quartermaster advised plaintiff's plant manager that his bid figures were too low and asked him to recheck them. Subsequently, when a representative of the Quartermaster visited the plant to conduct a pre-award survey, he reminded plaintiff that in his bid he neglected to allow for the cost of manufacturing and shipping crates, and for a rejection factor.

After the pre-award survey was conducted, plaintiff was invited to Chicago to attend a conference to discuss the proposal of November 16, 1953. Prior to the meeting, plaintiff submitted to defendant an informal proposal which amended the initial proposal by allowing a 20 per cent rejection factor. This increased the bid price on f. o. b.-plant to $103,117.26.

Subsequently, in a conference held on December 18, 1953, defendant's spokesman advised plaintiff's representative that their second informal proposal was too high, and as a consequence, the informal proposal was revised downward to a figure of $90,000 f. o. b.-plant. The difference between the second proposal and the one arrived at during the meeting was determined by reducing the rejection factor from 20 per cent to 10 per cent, and making other minor adjustments.

Various other matters pertaining to the contract were discussed. Plaintiff's representative advised defendant that he anticipated buying mill run lumber and screening from it the No. 1 and No. 2 red oak for use in producing the pins. Plaintiff's representative attempted to ascertain what inspection procedure would be used. He was told that he would subsequently receive an inspection guide. The guide which was eventually furnished plaintiff covered inspections with respect to quartermaster contracts in general, but did not specifically refer to the procedure to be used in inspecting tent pins.

On the day following the conference, plaintiff submitted a formal bid in the amount of $123,391.51 f. o. b. certain destinations. In the revised formal bid plaintiff increased his materials cost from $24,320.46 to $50,140 while reducing his labor costs from $35,165.63 to $25,200. After making other minor adjustments and adding a 10 per cent profit factor plaintiff's f. o. b.-plant price amounted to $90,791.17. Plaintiff also increased his delivery costs from $30,215.86 to $52,600.-34.

On December 10, 1953, Contract QM–23755 was awarded to plaintiff. For a consideration of $123,391.51 plaintiff agreed to manufacture and deliver 606,-525 type I 16-inch wood tent pins and 763,000 type II 24-inch wood tent pins. The contract also contained the usual provisions entitled "Changes", "Inspections" and "Disputes." Pins were to be produced in accordance with Military Specifications Mil–P–2383A. In addition to delineating the contract specifications, Mil–P–2383A provided that sampling and inspection would be conducted in accordance with Standard MIL–STD–105A. In determining whether pins were to be accepted by the defendant, MIL–STD–105 A provided for inspection of a certain number of samples based upon the lot size submitted. If the sample contained more than the minimum number of major and minor defective pins, the entire lot was to be rejected. The maximum number of defects which were to be allowed was determined by the Acceptable Quality Level (hereafter called AQL), established by defendant and thus would vary with changes in the AQL. The AQL for contract No. QM–23755 was specified by the defendant, but defendant never revealed to plaintiff the particular AQL established for this contract. Plaintiff insists that the failure of defendant to furnish plaintiff with the AQL it was using constituted a breach of contract. Plaintiff accordingly claims that he is entitled to relief because defendant omitted a specification of the contract. Plaintiff's contractual obligation was to produce pins according to certain specifications. All details specifying the kind of pins that were to be manufactured were set out in Mil–P–2383A referred to in the contract.

AQL is used to determine whether a sufficient number of defects (as defined in Mil–P–2383A) are found in the sample group of pins to warrant rejection of the entire lot. Since plaintiff was not advised of the AQL applicable, plaintiff could not anticipate in advance the number of defective pins he could produce without having an entire lot rejected. Inspector Burkhart never told plaintiff the number of major and minor defects which would be allowed in a sample size lot. Although plaintiff was prejudiced by lack of certain information known to defendant, he still had the basic duty under the contract to produce pins free from those defects prohibited by the specifications (Mil–P–2383A).

Plaintiff set up an assembly line whereby raw lumber which had been stored in a yard was put through a rip saw which cut it into rough strips. From there it went through the molder which planed it to the proper width and thickness. Once the pins were cut in the proper lengths they were processed through the rope-notching and pointing machines. At the end of the processing line the pins were dipped into a wood preservative.

On February 1, 1954, defendant's inspection supervisor and plaintiff executed an inspection plan which provided for only two inspection points (prior to the ultimate end-item stage). Once pins were molded they were to be tested for moisture and specific gravity. A stationary lot inspection for dimensional and visual defects was to be conducted before the pins were treated with a wood preservative.

Defendant's Inspector Burkhart arrived at plaintiff's plant on February 15, 1954. Upon his arrival he arbitrarily disregarded the prior inspection plan and established four inspection points all on a stationary lot basis. When production began in March, 1954, that change inconvenienced plaintiff to a great extent in that under stationary lot inspection the entire lot must be removed from the assembly line until testing of those samples chosen from the lot has been completed. Thus, production was delayed until the inspection was completed and the lot returned to the assembly line. The delay involved cannot properly be charged to plaintiff. In addition, on several occasions Inspector Burkhart aggravated the situation and increased the period of delay by refusing to inspect pins as they piled up at the second inspection station.

Approximately one month after production had commenced, the Quartermaster Inspection Service notified Inspector Burkhart that the sampling plan procedure should be changed to moving lot inspection. This change accelerated plaintiff's production. At about the same time Inspector Burkhart eliminated two of the additional inspection stations he had established. Testing for moisture content and density was now conducted on raw lumber. Dimensional and visual inspection was conducted only on finished pins after they had been dipped in the preservative.

In making his inspections Inspector Burkhart was most zealous. On a number of occasions he spoke to plaintiff's employees working on the assembly line and told them what defects they should look for in rejecting pins. He denied talking to anyone except Herman Adams, Ed Adams, plaintiff's brother and general superintendent, and Milus Bullington, plaintiff's tent pin production foreman, but the record supports a conclusion to the contrary. Although most of the pins which were rejected were discarded by plaintiff's employees under Inspector Burkhart's instruction, the record is devoid of specific proof as to the defects which the inspector told the employees would warrant rejection of pins. No conclusive evidence has been introduced which establishes the number of discarded pins which conformed to contract specifications.

The evidence adduced by plaintiff includes an attempt to show that approximately 200,000 white pins (finished pins except for the preservative), rejected by Burkhart, were offered to and accepted by the defendant in a subsequent contract. The record indicates that some of these pins were given away, other dis-

posed of as firewood or sold to Sears, Roebuck & Co. The record shows that defendant accepted some 76,000 pins which had been dipped in a preservative. It is not possible from the record to definitely ascertain when those pins were produced. A large number of unpreserved tent pins, exact number not established by the proof, were sold to the La Cost Construction Company.

■ In his visual examination, Inspector Burkhart considered pins to be defective even though some of the particular defects they contained were not specifically prohibited by the contract specifications. Mainly this was due to his reliance on the Defects Classification Procedure (Part B Supp.), as the standard to be applied. Part B Supplement, in effect, altered the basic specifications of the contract by classifying certain defects as minor even though they were not prohibited by the contract. Defendant did not give plaintiff a copy of that document, nor was plaintiff informed of its contents. Such failure is deemed to have been arbitrary and unwarranted. In a similar situation when defendant unilaterally altered the contract specifications, contractors have been allowed to recover the increase in cost that ensued. P. J. Carlin Construction Co. v. United States, 92 Ct.Cl. 280, 301–302 (1941).

Inspector Burkhart sometimes deviated from Part B Supplement by scoring various defects as minor, even though they were not so listed in his instructions.

■ Although no pin lots were rejected by Inspector Burkhart for failing the visual examination, the record supports a finding that defendant's inspection procedure definitely increased plaintiff's costs under such procedure by requiring a higher quality than was called for by the contract specification standard.[2]

Plaintiff failed to register a protest with the contracting officer concerning the arbitrary inspection to which he was subjected, but he did complain to the inspector and the inspector's supervisor. He did not file a complaint with the contracting officer pursuant to the "Dispute" clause or seek an equitable adjustment pursuant to the "Changes" clause.

■ Although in a strict legal sense, plaintiff does not have a claim enforceable in this court since he failed to exhaust his administrative remedies, this circumstance is not sufficient to defeat a claim for damages in a Congressional reference case. In such a case, plaintiff need only prove that he has an "equitable claim." This term "is not used in a strict technical sense meaning a claim * * * [cognizable] by courts of equity, but [is used in] the broader moral sense based upon general equitable considerations." Rumley v. United States, 169 Ct.Cl. 100, 105 (1965), quoting Burkhardt v. United States, 84 F.Supp. 553, 113 Ct.Cl. 658, 667 (1949). Applying "equitable" in this broad sense, the gravamen of plaintiff's claim is that the defendant's inspection demanded a higher quality product than was called for by the contract. It would appear to be "inequitable" to defeat this claim simply because plaintiff failed to exhaust his administrative remedies. That step is usually required because factual determinations made at the agency level are dispositive of claims when supported by substantial evidence. It does not have any bearing on the substantive nature of a claim.

Since it was Inspector Burkhart's continuous policy to demand a higher quality pin than called for in the contract, it is reasonable to assume that plaintiff was consequently required to use a better quality of wood and a larger quantity than was contemplated when the contract was negotiated. Evidence on this issue is rather meager; however, as discussed earlier, the proof is deemed to establish

2. Plaintiff does not complain about the inspection procedures followed by Inspector Burkhart's successor, Inspector Kallen, although the latter scored a few more visual and dimensional defects than were recorded by Burkhart, and sometimes considered defects to be minor even though they were not so listed in Supp. B. His percentage of rejections was negligible compared to the record made by Burkhart.

that a very high percentage of pins, in excess of 50 per cent, were discarded while being processed on the assembly line by Inspector Burkhart.

There is proof that the arbitrariness of Burkhart in deviating from contract specifications while making his visual inspection caused plaintiff a substantial increase in cost. Although there is proof in the record to show how much lumber was required for the three contracts which plaintiff had with defendant (No. QM–23755; No. QM–23925; No. QM–24050), the amount allocated to each contract is not revealed by the record. Herman Adams testified from memory at the trial that he anticipated that plaintiff would use 589,000 feet of lumber in performing the contract in suit, but 1,489,000 feet were used in that contract (No. QM–23755). He also testified that over 50 per cent of the material used in the manufacture of tent pins was rejected or discarded during the tenure of Inspector Burkhart.

Plaintiff did not keep any cost accounting records. His books and records reflect that his costs on the three contracts referred to in the preceding paragraph exceeded his income by $128,856.12. He claims no loss on Contracts No. QM–23925 and No. QM–24050.

■■ The record is deemed adequate to support a finding that Inspector Burkhart was unreasonable in attitude and arbitrary in decisions made with respect to acceptability of a large number of tent pins made by plaintiff.[3] Plaintiff's production problems, time-wise, were increased on occasion by the absence of Burkhart or his failure to promptly inspect pins which were ready for inspection. Although Burkhart came to plaintiff's plant with a plan for inspection of tent pins referred to as "Standard Inspection Procedures" and plaintiff repeatedly asked if he could see the inspection procedure which was being used, Burkhart repeatedly refused to grant such request. Plaintiff had received an instruction plan from the Quartermaster Corps which stated that the inspector would work closely with the contractor and keep him advised of the method of inspection being used.

Burkhart's inspection was so rigid that instead of a 10 per cent rejection factor it ran as high as 50 per cent or more. On the day that Burkhart left plaintiff's plant another inspector arrived and a subsequent check of his work was made by his supervisors and a report furnished plaintiff to the effect that the new inspector was doing a good job. Plaintiff agreed that the replacement inspector was competent and that there was no reason to complain concerning his inspection procedure or the result thereof. Following the arrival of the new inspector, the rejection factor dropped as low as 10 per cent.

The record also supports the conclusion that a substantial portion of the loss sustained by plaintiff is directly traceable to delay in production brought about by the extremely rigid, unreasonable and arbitrary conduct of Burkhart in connection with his responsibility as inspector during a period of approximately 3 months under the contract involved.

Based upon a careful review of the record, the audit accomplished by the F.B.I. agent, the testimony of Herman Adams with regard to the amount claimed, and the testimony of F.B.I. Agent Oliver, the court finds that the detailed audit made on behalf of defendant, which explains concisely and with good accounting reasons the bases for adjustments made in plaintiff's figures, adequately reflects the financial problem involved. Plaintiff has not challenged the results of defendant's audit.

A considerable amount of plaintiff's losses can be attributed to lack of busi-

3. In this connection, the court grants plaintiff's motion to admit into evidence three letters from Leland Foster, Burkhart's superior, to the Chicago Inspection Service. These letters are admissible as official reports. The motion to admit was not untimely or unduly delayed.

ness acumen as reflected by (1) failure to maintain adequate records; (2) a serious error in estimating the cost of the lumber for performance of the contract involved (the actual cost was almost double what plaintiff expected to pay for the lumber used); (3) failure to segregate the lumber used in the contract from the total amount purchased; and (4) an error in making an improvident bid, extremely low.

■■■■ Although the record made by plaintiff in attempting to prove the claim filed leaves much to be desired, the rule is that "uncertainty as to the amount of the damage does not preclude recovery where the fact of damage is clearly established." See Addison Miller, Inc., et al. v. United States, 70 F.Supp. 893, 900, 108 Ct.Cl. 513, 557 (1947), cert. denied, 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed. 408 (and other cases cited in that case). It is deemed to be established by the proof that one-third of the verified loss of $128,856.12 is traceable to the arbitrary, erroneous and unwarranted rejection of tent pins by Inspector Burkhart during the period of approximately 3 months when he was assigned to the contract, plus a failure or refusal during the tenure of Burkhart to make available to plaintiff information concerning the inspection procedures to which he was entitled, and the AQL set up for the contract. The attitude and lack of cooperation on the part of Inspector Burkhart was inexcusable. The inspection procedure was ultimately made available to plaintiff by successor inspectors.

Defendant has interposed a counterclaim for costs incurred by having to relet a contract for wood boxes concerning which plaintiff defaulted.

On May 28, 1954, plaintiff entered into Contract Cml–107, with the Army Chemical Corps to furnish 167,680 wood boxes. Pursuant to the default provisions of the contract the Contracting Officer terminated that contract as of October 1, 1954, because plaintiff had not delivered the balance of 62,269 boxes due under the contract. Plaintiff was prevented from completing the contract when, on Septem-

ber 30, 1954, the First National Bank of Fort Smith, Arkansas foreclosed a mortgage on his plant and facilities.

Contract Cml–107 was assigned to the bank by plaintiff on June 14, 1954, and there is no evidence that the bank ever reassigned it to plaintiff. By reason of plaintiff's default, defendant withheld payment of $972 due under two invoices to the assignee bank because plaintiff might be liable for excess recoupment costs. The counterclaim for $1,697.87 represents the costs defendant incurred in reletting the contract less the amount withheld which was due the assignee bank

■■■■ Defendant cannot prevail on this claim as it is collaterally estopped from denying that the foreclosure of the mortgage was caused by the action of Inspector Burkhart in making requirements beyond those called for in the contract. " * * * a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action," Edgar v. United States, 171 F.Supp. 243, 145 Ct.Cl. 9, 12 (1959), quoting Southern Pacific Railroad Co. v. United States, 168 U.S. 1, 48–52, 18 S.Ct. 18, 42 L.Ed. 355 (1897).

■■■■ In an earlier Adams case, (United States v. Adams, 160 F.Supp. 143 (W. D.Ark.) (1958)), defendant here brought an action against the Adams Manufacturing Co. (plaintiff here) to recover excess costs incurred in having another contractor complete the tent pin contract QM–23925 (not the contract involved in this action) on which plaintiff defaulted. One defense stressed by Adams was that his failure to complete performance of the contract was due to causes beyond his control and without his fault or negligence. The court sustained the defense, and found that the inability of Adams to complete the contract was caused by a foreclosure of a mortgage which the First National Bank had on his property. Her-

man Adams was unable to pay the debt on the mortgage and prevent its foreclosure because he sustained a loss on contract QM–23755 (the subject of the present suit). The court held that the loss was caused by two factors: (1) the over-zealous and changed inspection procedures used by Inspector Burkhart; and (2) the mistake of Adams in thinking he could obtain the necessary lumber for producing the tent pins at a cost of $45 to $50 per thousand feet, whereas, in fact the lumber he actually used cost him an average of $83 per thousand feet. The court concluded that the primary cause of plaintiff's financial difficulty and the resulting foreclosure of the mortgage on his property was the action of the inspector in making unnecessary requirements above and beyond those called for in the contract. United States v. Adams, supra, at 152.

It is clear, therefore, that since plaintiff was not able to complete contract Cml–107 because the First National Bank foreclosed the mortgage on his plant, and since it has already been judicially determined that this foreclosure was caused by the overly rigid inspection procedure of defendant's inspector on the contract in suit, QM–23755, it must be concluded that the default was due to causes beyond plaintiff's control and without his fault within the meaning of the contract. Defendant, therefore, cannot prevail on the first counterclaim and it should be dismissed.

Defendant has interposed a second and a third counterclaim alleging that plaintiff failed to pay excise tax with respect to his employees for the year 1954, as required by section 3301 Internal Revenue Code of 1954 (§ 1600 Internal Revenue Code of 1939). The excise tax, commonly referred to as FUTA (Federal Unemployment Tax Act), in essence, provides for unemployment insurance. Plaintiff filed the necessary Form 940 (FUTA tax return) for the year 1954 reporting therein a liability of $1,337.83, but failed to make any payment. In accordance with the unpaid return the amount, as reported, was assessed on Feb. 23, 1955. Subsequently, on March 29, 1957, an additional assessment was made by a representative of the Secretary of the Treasury for the year 1954 for additional FUTA taxes in the sum of $5,590.21. Pursuant to section 6502 Internal Revenue Code of 1954 (§ 874(b) Internal Revenue Code of 1939), the six-year statute of limitations on collections of tax liabilities, as relating to the assessment of February 23, 1955, was duly extended to February 23, 1967, with plaintiff executing a tax collection waiver.

 During the course of the trial the defendant introduced certain documents to establish the tax liabilities of the plaintiff. The law clearly establishes that the assessment is proved by the introduction into evidence of properly certified copies of the Certificate of Assessment and Payment (Form 899), the Assessment Certificate (Form 23) and the Statement of Tax Due (Form 17). United States v. Ettelson, 159 F.2d 193 (C.A. 7, 1947); Paschal v. Blieden, 127 F.2d 398 (C.A. 8, 1942). Proof of the assessment establishes a prima facie case and shifts the burden of going forward to the taxpayer. United States v. Rindskopf, 105 U.S. 418, 26 L.Ed. 1131 (1881).

 The burden, therefore, is switched to the plaintiff to overcome the presumption of liability arising from the Commissioner of Internal Revenue's assessment against him. United States v. Strebler, 313 F.2d 402 (C.A. 8, 1963). Since plaintiff has not refuted the presumption, it appears that defendant is entitled to judgment on the second and third counterclaims for FUTA taxes in 1954 in the total amount of $6,928.04, plus interest thereon as provided by law.

Our determination that defendant is entitled to recover on its second and third counterclaims requires us to follow the course taken in Maco Warehouse Co. v. United States, 169 F.Supp. 494, 144 Ct.Cl. 538 (1959). That was a congressional reference in which the plaintiff was held "equitably" entitled to an award but the

Government was held correct on a counterclaim. The court ruled that if the case came within our general jurisdiction (28 U.S.C. § 1491) the defendant could properly demand under 28 U.S.C. §§ 1503 and 2508, that judgment be entered on its counterclaim. Finding the case within the terms of 28 U.S.C. § 1491, the court held against the plaintiff on any "legal" claim—though informing Congress that the claimant did have a certain "equitable" claim—and then entered judgment on the counterclaim.

Similarly, we must hold that the present plaintiff's case is within our general jurisdiction under 28 U.S.C. § 1491. The suit is either for breach of contract or under the contract—matters within our adjudicatory competence—and the statute of limitations did not expire before the suit was begun. The only reason plaintiff cannot obtain a judgment on the merits of a "legal" claim is that he failed to pursue and exhaust his administrative remedies. Under 28 U.S.C. § 1492 (relating to Congressional references) we must dismiss his petition on the merits, although we do determine at the same time that he is "equitably" entitled to recover. And since the case is within our general jurisdiction, we shall, as in *Maco Warehouse*, supra, enter judgment for the defendant on its counterclaims Nos. 2 and 3 and against it on its counterclaim No. 1.

Plaintiff's petition must be dismissed but we find that he is equitably entitled to recover with respect to contract QM–23755 in the amount of $42,952.04, less the amount of the defendant's counterclaim. The defendant's first counterclaim is dismissed, and judgment is entered for defendant on the other two counterclaims in the sum of $6,928.04, plus interest as provided by law.[4]

This opinion and the findings of fact, together with the conclusions therein, will be certified by the Clerk to the House of Representatives pursuant to House Resolution 296, 86th Congress, 1st Session.

4. At the oral argument, defendant's counsel stated that the Government would stipulate not to collect the amount of

the counterclaims until Congress had had the opportunity to consider and pass upon this court's opinion and findings.