Stephen A. POTOTZKY

v.

The UNITED STATES.

No. 52–84T.

United States Claims Court.

June 3, 1985.

Rexford R. Cherryman, Virginia Beach, Va., for plaintiff.

David Gustafson, Washington, D.C., with whom were Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant. Mildred L. Seidman and Donald H. Olson, Washington, D.C., of counsel.

## OPINION

LYDON, Judge:

This case comes before the court on plaintiff's motion and defendant's cross-motion for summary judgment. In support of their respective motions, the parties have stipulated to and submitted plaintiff's testimony from his deposition as well as other documentation to be utilized by the court as a record upon which to base its determination and thus alleviating the necessity for a trial.

On January 27, 1982, the Internal Revenue Service (IRS) assessed a 100 percent penalty in the amount of $33,463.20 against plaintiff under the authority of 26 U.S.C. § 6672(a) (1976 & Supp.1984). The assessment was based on plaintiff's alleged liability for a penalty relating to federal income and social security (FICA) taxes due and owing from Kilian GMC, Inc. on the wages of its employees for the last quarter of 1978 and the first three quarters of 1979. On January 7, 1982, plaintiff paid $44.47, the amount of tax due during the delinquent period for one employee, and filed a timely claim for refund with the IRS, which it disallowed. This refund suit followed. Defendant counterclaimed for the unpaid portion of the penalty assessed against plaintiff.[1]

---

1. As stated above the 100 percent penalty initially assessed against plaintiff was for $33,463.20. However, defendant indicated in its answer to plaintiff's complaint that another responsible officer of Kilian GMC, Inc. had paid $20,753.24 in assessment penalties. The Internal Revenue Service (IRS) accordingly reduced its demand for payment from plaintiff to $12,665.49. This amount minus the $44.47 plaintiff has already paid became the new amount defendant was requesting in its counterclaim.

The court notes that an error may exist in the amount defendant is currently requesting in its counterclaim. The initial assessment amount of $33,463.20 minus the $20,753.24 penalty payment received from another Kilian GMC, Inc. officer leaves a difference of $12,709.96. If the amount plaintiff has already paid is subtracted from $12,709.96, the difference is $12,665.49. This figure would appear to be the proper figure for defendant's counterclaim. Defendant, apparently, inadvertently subtracted the $44.47 figure twice.

The issue presented to the court by the parties' motions for summary judgment is whether plaintiff was a person required, pursuant to 26 U.S.C. § 6672(a), to collect, truthfully account for, and pay over the payroll taxes of Kilian GMC, who willfully failed to do so. After considering the stipulated record and the briefs of the parties, applicable statutes, relevant case law, oral argument having been waived by the parties, the court concludes that plaintiff's motion for summary judgment should be granted and defendant's cross-motion should be denied.

### I.

Based on the record submitted to the court by the parties, the court makes the following findings of fact set out below in narrative form.

Sometime in 1972 or 1973, a truck dealership called Diamond GMC (Diamond) located in Nashville, Tennessee, experienced financial difficulties and subsequently went through bankruptcy. At that time, Edward J. Mikula (Mikula) was the manager of Diamond. In addition to Diamond's financial problems, it was also delinquent ($43,000) in paying over its payroll tax withholdings to the federal government. Mikula was in charge of issuing the payroll checks. During the period Diamond was experiencing financial problems, its owners requested plaintiff, who was an experienced financial consultant with a thorough knowledge of accounting and the current tax laws, to look into its financial trouble. From 1966 to 1970, plaintiff had worked on a part-time basis as Diamond's secretary-treasurer.

During plaintiff's investigation of Diamond, Mikula approached plaintiff and asked if he wished to join Mikula in purchasing the truck dealership. Plaintiff subsequently invested $40,000 and co-signed a $100,000 note and became a 22½ percent shareholder. Another individual,

David Hogan (Hogan) became a 10 percent shareholder. Mikula owned the remaining shares. In purchasing Diamond, the above group purchased its assets and the Diamond contract which was in Mikula's name. The record indicates that if Mikula died plaintiff at all times relevant to this case was to be named as Mikula's successor to the dealership with General Motors Corporation (GMC).

After the purchase, the group established a truck dealership in Norfolk, Virginia originally under the name Diamond Motor Trucks, Inc. However, its name was changed in January 1975 to Kilian GMC, Inc. (Kilian). Mikula was the president and treasurer of the corporation. Plaintiff became the vice president and secretary of Kilian while Hogan had no involvement in the management of the corporation. Both plaintiff and Mikula were directors of the corporation.

At all times relevant to this case, plaintiff owned and ran a financial consulting business. Up until 1974, he conducted this business in his home. At the end of 1974 or the beginning of 1975, plaintiff moved his consulting business onto the premises of Kilian. He maintained separate telephone lines, his own business sign and business cards. However, plaintiff admits that he was directly involved in the day-to-day management of Kilian from the time he moved onto the premises until he left at the end of 1976.

Plaintiff's responsibilities at Kilian from the end of 1974 until the end of 1976 primarily consisted of supervising the bookkeeping. He signed every check from Kilian.[2] He made sure that the proper federal taxes were withheld from the payroll and that such withholdings were paid over to a trust fund. Plaintiff also helped to establish some payment priorities. Mikula, on the other hand, was in charge of sales and maintenance services. It was apparent to the court from the record that Mikula had

---

**2.** Two signatures were required on all Kilian GMC (Kilian) checks and plaintiff generally insisted that his be one of the two signatures.

The court notes that plaintiff was from time-to-time identified as the corporation's secretary-treasurer though officially he was never the treasurer.

the ultimate authority within the company. When plaintiff hired a new office manager who subsequently fired Ruth Bolstad (Bolstad), Mikula's secretary, Mikula overruled plaintiff and fired the new office manager and rehired Bolstad.

Sometime in 1976, plaintiff realized that the business of the truck dealership was requiring too much of his time. He had hoped to spend no more than 40 percent of his time on Kilian matters but his ready access on the premises permitted Mikula and others to demand much more of his time. Plaintiff also became aware that his own secretary was being asked to do Kilian work. In addition, plaintiff was disturbed by the fact that Mikula overruled him on more than one occasion and failed to consult with him on such business matters as purchasing a yacht for the corporation or Mikula's act of granting himself a $5,000 salary increase. Based primarily on the excessive time demands placed on him, as well as these other problems, plaintiff decided to move his consulting business to a new location.

The record indicates that after plaintiff left the premises of Kilian on or about January 1, 1977, his involvement in the day-to-day management of Kilian dramatically decreased. As of the beginning of 1977 he neither signed a single Kilian check nor was he requested to do so. Plaintiff essentially relinquished all of his book-keeping and other responsibilities to Mikula at the beginning of 1977. Many of these responsibilities were assumed by Bolstad. Though it is clear that plaintiff had some involvement in the Kilian business affairs after January 1, 1977, the record indicates that such involvement can be characterized more as a consultant/client relationship. After January 1, 1977, plaintiff's primary dealings with Mikula and Kilian revolved around his effort's to help sell the truck dealership. Plaintiff prepared reports on Kilian to attract prospective buyers. The preparation of these reports, which were based primarily on sales projections, was billed to Kilian by plaintiff's consulting business. Plaintiff was involved in two

attempts to sell the business in 1977 and once in 1978.

After January 1, 1977, plaintiff visited Kilian perhaps once every two months and never after business hours. He did, however, continue to receive monthly financial statements regarding the Kilian business. These statements were sent to him by Bolstad. He also was able to review a copy of his own account with Kilian on a regular basis. It was apparent from the record that plaintiff's visits to Kilian were primarily related to his efforts in trying to sell the business. As a director and one of the three shareholders of the corporation, plaintiff also regularly attended Board of Directors and Shareholders meetings at Kilian after January 1, 1977. These visits along with his practice of reviewing his account and the monthly statements were also a part of his efforts to protect his investment in the business.

Sometime in May of 1978, plaintiff discovered, through the monthly financial statements he was receiving, that Mikula was not maintaining a proper trust fund for certain truck sales. At the same time, Mikula was not paying the manufacturer all that it was due. When he went to Kilian to discuss these irregularities, he learned that the locks to the premises had all been changed and thus he no longer had access to the dealership after business hours. When plaintiff questioned the financial discrepancies, Mikula also ordered Bolstad to cease sending plaintiff the monthly financial statements.

Sometime in the beginning of 1977, plaintiff requested that his salary be reduced to $1.00 per week. This reduction in pay resulted in an annual payment of approximately $6,500 or 24 semi-monthly payments of $270.83. Of that $270.83, $269.83 was for insurance coverage and the required income tax and Social Security withholdings. He requested this arrangement so that the insurance coverage he had through Kilian would continue until he completely resigned from the corporation. The record indicates that on November 16, 1977, plaintiff resigned his position as vice

president of the corporation. He maintained his position as secretary and director only to "keep the [his] foot in the door" to protect his $40,000 investment and his status as cosignator on a $100,000 note. He resigned as secretary on March 26, 1979 and as director shortly thereafter.

The record supports a finding that after January 1, 1977, plaintiff had very few "business" discussions with Mikula. These discussions primarily focused on the efforts of plaintiff and Mikula to sell the dealership. They never discussed day-to-day management affairs and plaintiff did not make suggestions concerning the prioritizing of payments to creditors other than to urge Mikula to pay off the $100,000 note.[3]

On April 19, 1977, plaintiff did sign a bank signature card which gave him the authority to sign Kilian checks. However, he never exercised that authority. Plaintiff also thought that, after he resigned his position as vice president, he lost his check-signing authority though in fact that was not the case due to the fact that he had signed the check-signing authority cards both in his capacity as vice president and as secretary.

In March of 1979, Bolstad contacted plaintiff at his financial consulting office. Bolstad had become aware of the fact that Mikula had not placed the withheld payroll taxes in a trust fund and Kilian owed $17,000 to the federal government in withholding taxes for the last quarter of 1978. Unable to explain the situation to Bolstad over the telephone, plaintiff went to Kilian to explain the problem and its potential consequences. When plaintiff arrived, he explained to Bolstad that she could be held personally liable for the delinquency.[4] Bolstad asserted that the delinquency was Mikula's fault. At that point, plaintiff confronted Mikula and urged him to pay the withheld payroll taxes. Mikula claimed that he was about to sell the business and the proceeds from the sale would cover the delinquency. After the March 1979, meeting, the record indicates that plaintiff decided to resign as secretary and director of the corporation and to absorb any losses he might incur surrounding his investment in Kilian GMC. Plaintiff did attend the annual shareholder's meeting after he resigned as secretary and he did draft the minutes for that meeting. He neither confirmed that the business was being sold nor did he inquire further into the tax delinquency problem.

During the March 1979, meeting, plaintiff observed that Bolstad had prepared the necessary checks to pay the withholding taxes which were due. Bolstad had signed the checks, but a second signature was required. Plaintiff, however, did not provide the necessary signature. Plaintiff explained that he did not offer to sign the checks because he had not signed any checks since January 1, 1977, and he felt that after he resigned as vice president he no longer had the authority to sign Kilian checks. Plaintiff also stated that Bolstad indicated that Kilian had insufficient funds to pay the delinquent taxes and plaintiff did not wish to become liable for the issuance of bad checks.

The record evidences that plaintiff was unaware of the tax delinquency for the last quarter of 1978 until the March 1979, meeting with Bolstad. It is apparent that, after

---

3. The $100,000 was only partially paid off by Kilian when the bank called the note. As a co-signer on the note, plaintiff was obligated at that time to borrow money to pay half the outstanding balance.

Defendant points out that many of the minutes to the meetings of the Board of Directors indicated that "[g]eneral business matters were discussed at length." Defendant claims that such statements found regularly in the minutes indicate that plaintiff was discussing business with Mikula. Plaintiff explained in his deposition that as the secretary of those meetings he routinely noted that general business matters were discussed though in reality no such discussions ever took place. The court is persuaded by his testimony and notes that defendant has introduced no evidence from any other person who attended those meetings to contradict plaintiff's assertion.

4. Plaintiff was familiar with the potential liabilities in this area due to his previous involvement in a similar withholding tax problem at Diamond GMC.

plaintiff completely washed his hands of the entire Kilian business, he assumed the payroll taxes were being paid because of his familiarity with the potential consequences if such taxes were not paid. He had not been informed that any such potential consequences had occurred. However, on December 6, 1979, plaintiff was interviewed by R.O. Kight (Kight) of the IRS, who informed plaintiff that Kilian had been delinquent in paying over its payroll taxes for the period October 1, 1978, through September 30, 1979. Sometime at the end of September 1979, Kilian had filed for bankruptcy.

On January 27, 1982, the IRS proposed an assessment against plaintiff of a 100 percent penalty, pursuant to section 6672 of the Internal Revenue Code for failing to remit payroll taxes for the fourth quarter of 1978 and for the first three quarters of 1979. The IRS indicated that there were no corporate assets available to satisfy the tax liability and thus it was assessing a penalty of $33,463.20 against plaintiff. The IRS considered plaintiff to be "a person required to collect, account for, and pay over withheld taxes for [Kilian GMC, Inc.]."

On January 7, 1983, plaintiff paid to the IRS $44.47. This amount represented the delinquent payroll taxes and withholding for Lonnie Kenley, an employee of Kilian. On January 18, 1983, the IRS filed a notice of a federal tax lien in the amount of $33,418.73 with the Clerk of the Court for the City of Norfolk, Virginia. On or about February 8, 1983, the IRS notified plaintiff that the penalty assessment had been reduced from $33,463.20 to $12,668.49.[5]

On March 11, 1983, taxpayer filed with the IRS a claim for a refund of the $44.47 he had already paid as a part of the tax

assessment. This claim was denied by the IRS in a letter dated January 11, 1984. Plaintiff subsequently filed his complaint in this court seeking to recover the $44.47 in taxes he has already paid and abatement of the $33,463.20, or revised $12,668.49, tax assessment.

## II.

As stated above, the primary statutory provision at issue in this case is 26 U.S.C. § 6672(a) (Supp.1984). Section 6672(a) states in pertinent part:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

Section 6671(b) of title 26 defines "person" for purposes of section 6672 as follows:

(b) Person defined—The term "person", as used in this subchapter, includes an officer or employee of a corporation * * who as such officer, employee * * * is under a duty to perform the act in respect of which the violation occurs.

Based on section 6672, a person is liable for a 100 percent penalty if two separate statutory requirements are present. First, the person must have the duty to collect, account for, and pay over any taxes imposed by title 26. Such a person is labelled

---

**5.** From defendant's Answer and the evidence in the record, it is apparent that the IRS was able to collect a portion of the assessment ($20,-753.24) from Mikula. However, it appears that the IRS was unable to collect the entire amount of delinquent taxes from Mikula and thus it was attempting to acquire the remainder from plaintiff.

On May 5, 1983, plaintiff posted a bond to suspend the collection of the penalty. Despite

the posting of this bond, plaintiff alleges that the IRS has failed to release its lien as is required by 26 U.S.C. § 6325(a)(2) (1976 & Supp. 1984).

The court notes that the figure of $12,668.49 does not correspond to any of the figures in defendant's answer. Based on the record, the court believes that this figure is inaccurate.

a "responsible person." [6] Second, the "responsible person" must have *willfully* failed to collect, account for, and pay over the taxes or have *willfully* attempted to evade or defeat the payment of taxes. Both statutory requirements must be established in order to impose the 100 percent penalty. *See McCarthy v. United States*, 194 Ct.Cl. 42, 53–54, 437 F.2d 961, 967 (1981). Therefore, the court must determine: 1) whether plaintiff was a "responsible person" at the relevant time, and 2) if plaintiff was a "responsible person", whether he acted willfully to evade the payment of the taxes in issue.

### A. *"Responsible Person"*

The determination of whether or not an individual is a "responsible person" is a fact question. *See Bauer v. United States*, 211 Ct.Cl. 276, 286, 543 F.2d 142, 148 (1976). "Any corporate officer or employee with the power and authority to 'avoid the default' or to direct the payment of the taxes is a responsible person within the meaning of section 6672." *Feist v. United States*, 221 Ct.Cl. 531, 539, 607 F.2d 954, 960 (1979) (citing *White v. United States*, 178 Ct.Cl. 765, 771, 372 F.2d 513, 516 (1967)). The court must look beyond organizational form and look for those people "actually responsible for an employer's failure to withhold and pay over the tax." *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed.Cir.1984) (citing *Pacific National Ins. Co. v. United States*, 422 F.2d 26, 31 and n. 12 (9th Cir.1970), *cert. denied*, 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269. Section 6672 encompasses all of the officers and employees of a corporation who have such responsibilities even though liability may be imposed on more than one person. *Godfrey v. United States, supra*, 748 F.2d at 1575 and cases cited therein.

The proper focus for the court in this case is to look for the person with the "ultimate authority over the expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes." *Id.*, 748 F.2d at 1575 (citing *White v. United States, supra*, 178 Ct.Cl. at 771, 372 F.2d at 517). The court must determine from a review of the record submitted in this case whether plaintiff had "the final word as to what bills should or should not be paid and when." *Wilson v. United States*, 250 F.2d 312, 316 (9th Cir.1958) (as cited in *Pacific National Ins. Co. v. United States, supra*, 422 F.2d at 31).

Defendant argues that plaintiff is presumed to be a responsible person by virtue of the fact that he was the corporation's secretary at the time of the initial delinquency period, citing *Farris v. United States*, 4 Cl.Ct. 633, 636 (1984). Defendant argues that plaintiff has failed to overcome this presumption. Given the tenor of the *Godfrey v. United States, supra*, decision, the court must now reject any such "presumption." It may be true that, in fact, most corporate officers have the "authority to make disbursements," as the Court of Claims required, before it would presume that a corporate officer was a "responsible person." *Bolding v. United States*, 215 Ct.Cl. 148, 159, 565 F.2d 663, 670 (1977) (as cited in *Farris v. United States, supra*, 4 Cl.Ct. at 636). However, the Federal Circuit Court of Appeals made it clear that a fact-finder must focus on substance and not form. The court emphasized that the fact-finder must determine the person or persons with the ultimate authority and power "to compel or prohibit the allocation of corporate funds." *Godfrey v. United*

---

**6.** In commenting on the term "responsible person" the Federal Circuit Court of Appeals in *Godfrey v. United States*, 748 F.2d 1568, 1574 n. 4 (Fed.Cir.1984) stated:

"The term 'responsible person' is an invention of the courts, having no statutory definition or discussion in the legislative history. As the Supreme Court recently noted in *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251:

'The cases which have been decided under § 6672 generally refer to the "person required to collect, truthfully account for, and pay over any tax imposed by this title" by the shorthand phrase "responsible person." We use that phrase without necessarily adopting any of the constructions placed upon it in the decision.'

436 U.S. at 246 n. 7, 98 S.Ct. at 1784–85 n. 7."

*States, supra* 748 F.2d at 1576. Clearly, the Court of Appeals indicated that the mere fact that an individual is a corporate officer does not make him a "responsible person."

Defendant argues that *Godfrey v. United States, supra,* is distinguishable on its facts and therefore, not controlling. It argues that *Godfrey* involved an "outside director" who was not an officer of the corporation. This court believes that defendant is emphasizing excessively the technical positions of individuals while ignoring the actual authority they may have exercised within their respective corporations. Clearly, the plaintiff in *Godfrey* was not a corporate officer as plaintiff was in this case. The plaintiff in this case also owned a larger share of his corporation than the plaintiff in *Godfrey.* However, the trial court in *Godfrey* found the plaintiff to be the "single most important individual directing the business affairs of the corporation." *Godfrey v. United States,* 3 Cl.Ct. 595, 604 (1983). Plaintiff in this case had been a very active officer in the corporation, but as of January 1, 1977, he ceased to exercise his authority though he maintained his titles. *Godfrey* clearly points out that the proper focus in these cases is not on an individual's formal title but upon his ultimate power to disburse corporate funds. Therefore, the court concludes that *Godfrey* is controlling in this case and the mere fact that plaintiff was Kilian's secretary does not make him a "responsible person" without more.

■ The burden of proving whether plaintiff is a "responsible person" falls upon the plaintiff. Clearly, the taxpayer has the burden of proof as to his claim for a refund. The general rule would place the burden of proof on the government to prove its counterclaim. However, the court in *Psaty v. United States,* 442 F.2d 1154, 1159–60 (3d Cir.1971), found that the presumptive correctness afforded to the Commissioner's assessment determination allows the government to establish a *prima facie* case of liability merely by offering into evidence a certified copy of the assessment. *See also Adams v. United States,* 175 Ct.Cl. 288, 301–02, 358 F.2d 986, 994 (1966). Once that *prima facie* case is made out both the burden of going forward with evidence and the ultimate burden of persuasion shifts to the plaintiff. *Psaty v. United States, supra,* 442 F.2d at 1160. *See also Lesser v. United States,* 368 F.2d 306 (2d Cir.1966); *United States v. Lease,* 346 F.2d 696 (2d Cir.1965); *United Airline Co. v. Commissioner,* 316 F.2d 701 (1st Cir.1963). *But see United States v. Molitor,* 337 F.2d 917, 922–23 (9th Cir. 1964). Therefore, the general rule is that plaintiff must prove by a preponderance of the evidence that he is not a "responsible person," and thus defendant's assessment is erroneous. *Psaty v. United States, supra,* 442 F.2d at 1160; *Datlof v. United States,* 252 F.Supp. 11 (E.D.Pa.1966), *aff'd,* 370 F.2d 655 (3d Cir.1966), *cert. denied,* 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 624 (1967).

■ After a thorough review of the stipulated record in this case, the court finds that plaintiff has proved by a preponderance of the evidence that he was not a "responsible person" at the relevant times in this case. The court notes that defendant takes issue in a most generalized and unspecified manner with the admissibility of some of the documentary evidence submitted by plaintiff. The court assures the parties that it has reviewed all of the documents submitted and has attributed to them the proper weight in arriving at its conclusions. Clearly, prior to January 1, 1977, plaintiff was a "responsible person." Plaintiff admitted that he was in charge of ensuring that the taxes were properly handled. He was directly involved in the day-to-day operations of the corporation, he prioritized the order of paying creditors, he signed almost all of the checks leaving Kilian, and he was receiving a salary from the corporation. These facts regarding plaintiff prior to January 1, 1977, would clearly satisfy the requirements of a responsible person as set out in *White v. United States, supra,* 178 Ct.Cl. at 768–70, 372 F.2d at 514–15 (as cited in *Godfrey v.*

*United States, supra,* 748 F.2d at 1575). However, after January 1, 1977, plaintiff relinquished the authority he had exercised prior to that time. Clearly, as of the delinquent period, October 1978 through September 1979, he had relinquished almost all of his control which he once had at Kilian.

After January 1, 1977, plaintiff ceased signing checks for Kilian. He moved from the business premises and relinquished all of his day-to-day responsibilities. He was no longer in charge of ensuring that the taxes were handled properly. He requested that his salary be reduced to $1.00 semi-monthly so that his company insurance coverage would continue until he had completely resigned from his corporate offices. Even prior to his leaving the premises of Kilian, Mikula overruled plaintiff upon occasion. After plaintiff left, the record makes it clear that the person with the ultimate authority over the financial and other management decisions was Mikula. Plaintiff was also effectively locked out of the premises sometime after January 1, 1977.[7] Plaintiff's relationship with Mikula became quite cool and it was a business relationship which this court characterizes as a consultant/client arrangement. Plaintiff's primary involvement, outside of shareholder and director meetings, with Mikula and Kilian was his efforts to help sell the dealership. No other business was discussed and plaintiff did not attempt to advise Mikula on the day-to-day affairs of the corporation. It is true that plaintiff signed a bank signature card which continued his authority to sign Kilian checks on April 19, 1977, which was after the date upon which he relinquished his duties and left the premises of Kilian. However, the rule is that the mechanical duty or ability to sign checks alone is not determinative of liability under section 6672. *Godfrey v. United States, supra,* 748 F.2d at 1575. The Court

of Claims did state that: "Authority to cosign [checks] in effect gives one the authority to decide which creditors should be paid." *Burack v. United States,* 198 Ct.Cl. 855, 869, 461 F.2d 1282, 1291 (1972). However, this rule, as set out in *Burack,* has been limited. In *Barrett v. United States,* 217 Ct.Cl. 617, 624–25, 580 F.2d 449, 453 (1978) the Court of Claims stated:

> However, in the *Burack* and *Flan* cases, other circumstances set forth in those decisions placed the check-signing authority in context and disclosed that the responsible persons in those cases possessed authority over corporate affairs that extended beyond mere check-signing authority. Case law discloses that authority to sign checks, without more, is a weak pillar on which to rest a liability determination that a person is properly subject to a 100 percent penalty under section 6672.

In this case, plaintiff technically had the authority to sign Kilian checks but he neither signed any after January 1, 1977, nor was he asked to do so. Plaintiff also resigned as vice president of the corporation on November 16, 1977. Plaintiff indicated that as of his resignation from his position as vice president he assumed that he no longer had check-signing authority. The court recognizes that plaintiff also signed the signature cards in his capacity as secretary and thus it attributed little weight to plaintiff's mistaken belief. These facts, as a whole, combined with the fact that plaintiff relinquished all of his other authority regarding the management of the corporation, convince the court that plaintiff's known or unknown power to sign checks was insufficient to make him a "responsible person." *See Barrett v. United States, supra.*

---

**7.** Sometime prior to July 1978, the locks and burglar alarm system were altered at Kilian without plaintiff's knowledge, which precluded plaintiff from entering the premises outside of regular business hours. This action by Mikula preceded the first delinquent period by at least two months. Plaintiff's inability to enter the premises after hours indicates a complete erosion of any prior management authority plaintiff may have had. Being effectively "locked out" supports the court's conclusion that plaintiff could not be considered a "responsible person" during the relevant delinquency periods. *See Dudley v. United States,* 70–2 USTC 84,200, 84,203 (9th Cir.1970). *See also Klotz v. United States,* 79–2 USTC 88,004, 88,005 (9th Cir.1979).

It is uncontradicted in this case that plaintiff maintained his position as secretary of the corporation until approximately March 26, 1979. He resigned his position as secretary shortly after learning of Kilian's tax delinquency for the last quarter of 1978. The record indicates that plaintiff's only function as secretary after January 1, 1977, was to draft corporate minutes and associated correspondence. However, plaintiff may have drafted those minutes merely in his capacity as a director and a shareholder since he continued to do so after he resigned as secretary. Plaintiff indicated that the only reason he maintained his position as secretary was to keep his foot in the door to protect his investment. As stated earlier, the mere fact that plaintiff was the secretary of the corporation does not make him a "responsible person." As the Federal Circuit pointed out in the analogous case, *Godfrey v. United States, supra,* it is clear that "a person's 'duty' under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form." *Id.,* 748 F.2d at 1576. The facts indicate in this case that, as secretary of Kilian after January 1, 1977, plaintiff had no power "to compel or prohibit the allocation of corporate funds."

The Court of Appeals, in *Godfrey v. United States, supra,* 748 F.2d at 1575–76, listed several additional factors which may indicate whether or not an individuals a "responsible person." These factors include: 1) did the person control the disbursement of payroll; 2) did the person control the voting stock of the corporation; 3) did he participate in the day-to-day management of the corporation; 4) did he determine which creditors would be paid and which would not; 5) did he come to the corporate office daily; 6) did he hire and fire employees or have the authority to do so; 7) did he draw a regular salary. As to these additional factors a negative response for plaintiff would be appropriate after January 1, 1977. Clearly, the answers would be "no" for the delinquency period at issue.

One point expressly and implicitly emphasized by defendant is plaintiff's knowledge of Kilian's financial condition and failure to pay its tax obligations. Plaintiff claims his knowledge of the corporation's finances was limited and as of July, 1978, when Mikula ordered Bolstad to stop sending plaintiff monthly financial statements, his source of information was extinguished. As far as the tax delinquency in particular, the record indicates that plaintiff became aware of the delinquency for the last quarter of 1978 in March of 1979. After confronting Mikula and urging him to pay the taxes, Mikula responded that the proceeds from the sale of the business would cover the $17,000 tax bill. At that point plaintiff washed his hands completely of the entire affairs of Kilian. It was not until December 6, 1979, that plaintiff learned that Kilian had failed to withhold and pay over any payroll taxes for the last quarter of 1978 and the first three quarters of 1979.

Even assuming *arguendo* that the facts indicated that plaintiff knew of Kilian's failure to pay its tax obligations, such knowledge is irrelevant in considering whether he was a "responsible person" under 26 U.S.C. § 6671(b). *Godfrey v. United States, supra,* 748 F.2d at 1576. Plaintiff's knowledge of nonpayment is, at most, relevant to the issue of willfulness. *Id.* (citing *Marlowe v. United States,* 2 Cl.Ct. 711, 716 (1983)).

Further support for the court's conclusion that plaintiff is not a responsible person can be found in an analysis of the facts in *Godfrey v. United States, supra.* In *Godfrey,* the Federal Circuit found that the plaintiff was not a responsible person. The plaintiff in *Godfrey* was the Chairman of the Board of Directors of the corporation at issue. He had no office at the corporation and received no salary. The plaintiff neither signed any corporate checks nor prepared or signed any tax forms. The plaintiff did exercise his authority given him by the bylaws. He elected officers, hired top level consultants, delegated authority to set up bank accounts and designated signatories for those accounts. *Godfrey v. United States, supra,* 748 F.2d at

1571. He also authorized borrowing and sales programs, ratified and approved settlements made by others, and approved loan agreements with banks. Additionally, he authorized the filing of the corporation's bankruptcy petition. *Id.*

The plaintiff in *Godfrey* also attempted to sell some or all of the assets of the corporation in a recapitalization effort. Godfrey was fully aware of the corporation's unpaid withholding taxes (income and FICA) but he stated in response to one officer's concern about non-payment, "no one ever goes to jail for not paying taxes, so I wouldn't be too concerned about it." *Id.,* 748 F.2d at 1572 (citing *Godfrey v. United States,* 3 Cl.Ct. 595, 601 (1983)). As stated earlier, the trial court characterized Godfrey as the "single most important individual directing the business affairs of the corporation." *Godfrey v. United States, supra,* 3 Cl.Ct. at 604. The Federal Circuit found this to be "material but not controlling." *Godfrey v. United States, supra,* 748 F.2d at 1575–76.

Comparing plaintiff's authority and role in the corporation in this case with the plaintiff in *Godfrey,* it is clear that after January 1, 1977,[8] plaintiff generally had far less authority than the plaintiff in *Godfrey.* The court concludes that if the plaintiff in *Godfrey* could not be considered a "responsible person" then certainly the plaintiff in this case is not such a person.

### B. *Willfulness*

Assuming, *arguendo,* that plaintiff was a "responsible person" under section 6672, the court finds no evidence in the record to support a determination that he "willfully" failed to collect, account for, or pay over the taxes, or willfully evaded or defeated the taxes.

**8.** The court notes that the fact that plaintiff may have been a "responsible person" prior to January 1, 1977, does not make him one in this case. The proper focus must be on the person's authority and responsibilities at the times relevant to the delinquency period and not almost two years before the delinquency period began. Otherwise, individuals who retire from a corporation, who sell their company, or who relin-

In determining whether a failure to pay taxes was willful, the Court of Claims concurred that "willfully" "means a deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the Government, and that it is not necessary that there be present an intent to defraud or to deprive the United States of the taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness." *White v. United States, supra,* 178 Ct.Cl. at 778–79, 372 F.2d at 521. *See also Godfrey v. United States, supra,* 748 F.2d at 1576–77; *Fiest v. United States, supra,* 221 Ct.Cl. at 541, 607 F.2d at 961; *Scott v. United States,* 173 Ct.Cl. 650, 655–56, 354 F.2d 292, 295 (1965). Generally, if a person knows that taxes are due, but he uses corporate money to pay other creditors or for other business purposes, he has been found to have willfully disregarded his duty. *See Fiest v. United States, supra,* 221 Ct.Cl. at 541, 607 F.2d at 961 and cases cited therein.

A showing that an individual was negligent in not ascertaining the facts regarding a tax delinquency is insufficient to prove willfulness. *Id.,* 221 Ct.Cl. at 541, 607 F.2d at 961; *Bauer v. United States, supra,* 211 Ct.Cl. at 289, 543 F.2d at 150. However, willful conduct can also include a responsible person's reckless disregard of his duty to collect, account for, and pay over taxes or that he ignored an obvious and known risk that taxes would not be paid. *Godfrey v. United States, supra,* 748 F.2d at 1577; *Fiest v. United States, supra,* 221 Ct.Cl. at 542, 607 F.2d at 961. The Court of Claims in *Fiest v. United States* stated:

> The concomitant of this rule must be that absence of willfulness can be proved by an affirmative showing that the responsible person did *not* disregard his duties,

quish responsibilities (like plaintiff) or have them taken away from them some time prior to a delinquent period could be held liable. Such a finding of liability would be contrary to the intent of section 6672. *See Slodov v. United States,* 436 U.S. 238, 254, 98 S.Ct. 1778, 1788–1789, 56 L.Ed.2d 251 (1978) (no imposition of liability without personal fault).

and that he undertook all *reasonable efforts* to see that such taxes would in fact be paid, in circumstances where the employer had the means of payment and could reasonably be expected to make the payment. (Emphasis added.)

[*Id.*, 221 Ct.Cl. at 542, 607 F.2d at 961.] Additionally, willfulness includes an element of personal fault thus requiring some relevant evidence regarding a responsible person's fault. *See Slodov v. United States, supra*, 436 U.S. at 254, 98 S.Ct. at 1788–1789; *Fiest v. United States, supra*, 221 Ct.Cl. at 543, 607 F.2d 962.[9]

[8] It is true in this case that sometime in March of 1979, plaintiff learned that Kilian was delinquent on its withholding taxes (income and FICA) for the last quarter of 1978. After being informed of the problem, plaintiff went to Kilian and confirmed the delinquency. He immediately informed Bolstad of her potential liability and urged her to pay the taxes. Bolstad informed plaintiff that it was Mikula's fault. Plaintiff then confronted Mikula and asked him to pay the taxes. Mikula explained that he would take care of the taxes with the proceeds from the sale of the business. The court believes that, given plaintiff's limited power in the corporation at the time, plaintiff did all he could do in an attempt to ensure that the taxes were paid. His sole act was "an instruction looking to payment and not to evasion and defeat." *Godfrey v. United States, supra*, 748 F.2d at 1577.

Defendant also emphasizes the fact that when plaintiff went to the premises of Kilian in March of 1979, Bolstad had already prepared the necessary checks to pay the taxes. These checks only needed another signature which plaintiff could have, but did not provide. The court believes that plaintiff's actions in only urging Mikula

and Bolstad to pay the taxes instead of signing the checks himself were reasonable. First, plaintiff claims he had no knowledge of his ability to sign the checks, based on his misbelief that he had relinquished such authority and the fact that he had not signed any Kilian checks in over two years, which appears to negate the proposition that he acted consciously in defeating the payment of taxes. Second, having relinquished his authority to Mikula and having been overruled by Mikula in the past, it would not have been unreasonable to assume that Mikula would have prevented the payment of the taxes. Third, Bolstad mentioned to plaintiff that Kilian had insufficient funds to pay the $17,000 delinquency. Plaintiff had no reason to question this statement and signing checks with insufficient funds to back them up could have opened plaintiff up to certain liabilities. Finally, Mikula assured plaintiff that he would pay the taxes with the proceeds from the sale of the business. Plaintiff, knowing that Mikula was aware of the potential liabilities if the taxes were not paid, because of Mikula's prior experience with unpaid taxes at Diamond GMC, had no reason to doubt this assurance that the taxes would be paid. Therefore, the court finds that it was reasonable for plaintiff not to sign the prepared checks and his failure to do so was not a willful attempt to evade the payment of taxes.

Defendant argues that plaintiff could have, and should have done more to ensure that the taxes were paid. It claims that plaintiff should have either signed the checks after inquiring at the bank concerning the availability of funds or worked with Mikula to set up a plan for paying these delinquencies. The court does not concur with this position.

---

**9.** The court notes that it is not clear from case law which party has the burden of proving the willfulness of plaintiff's conduct. The cases cited in the text *supra* would indicate that plaintiff has the burden of proof on all issues surrounding the propriety of defendant's tax assessment. However, at least two courts have ruled that the defendant has the burden of proof as to the willfulness of the plaintiff's conduct. *See Molitor v. United States*, 337 F.2d 917, 922–23 (9th Cir.1964); *Clark v. United States*, 58–1 USTC 67–795, 67–798 (1958). The court finds it unnecessary to enter this thicket concerning who has the burden of proof on the willfulness issue because it finds that the plaintiff has satisfied the burden of proof whatever it may be.

All that plaintiff was required to do was to do "... all he could reasonably do in the circumstances to see that the taxes were paid." *Fiest v. United States, supra,* 221 Ct.Cl. at 542, 607 F.2d at 961–62. When considering the circumstances of a case it is necessary to look at both an individual's actions and his power to act, *i.e.,* the facts surrounding his characterization as a "responsible person." Defendant apparently assumes that by virtue of plaintiff's position as the secretary and a director he had both the technical and actual power to compel the payment of the taxes. However, as the court has stated, plaintiff's actual relationship with Kilian had become strictly that of a consultant. Whatever authority plaintiff may have had in the bylaws as secretary had been relinquished over two years previously. It is clear to the court that both plaintiff's perceived and his actual power to compel the payment of the taxes had disappeared. Therefore, plaintiff's efforts in urging Mikula and Bolstad to pay the taxes were entirely reasonable under the circumstances of his limited powers within the corporation.

Defendant also asserts that Bolstad's proposal to cover up the tax deficiency and Mikula's prior "negligence and stupidity" regarding payroll taxes at Diamond GMC constituted an obvious and known risk that the taxes would not be paid. The court does not find a relationship between Bolstad's proposal to alter the W–2 Forms and her statement that there were no funds available to pay the taxes. If anything, her proposal to cover up the tax problem made her statements concerning the availability of funds more believable and thus it was reasonable for plaintiff to rely on her claim that no funds existed. It was also reasonable for plaintiff to believe that, after one encounter with the potential consequences of section 6672 at Diamond GMC, Mikula was no longer "stupid" regarding the necessity to pay over the payroll taxes to the government. Plaintiff's knowledge

of Mikula's awareness of the potential liabilities associated with the nonpayment of such taxes made his reliance on Mikula's assurances more reasonable.[10]

The court also finds it reasonable to conclude that plaintiff had no knowledge of Kilian's delinquencies for the first three quarters of 1979. After plaintiff's March 1979, meeting with Bolstad and Mikula he totally divorced himself from the corporation, except for attending a stockholders' meeting, and he conceded that his investment was lost. After this complete separation, plaintiff had no way of knowing of any tax delinquencies. In fact, he reasonably speculated that the taxes were being paid because the dealership was still doing business which he assumed may not have been the case had the taxes not been paid.

Defendant implies that plaintiff's knowledge of the corporation's delinquent tax situation for the last quarter of 1978 created a duty to inquire into and cure any new deficiencies, and his failure to do so constituted a willful failure to carry out his duties. The Court of Appeals, in *Godfrey v. United States, supra,* 748 F.2d at 1577–78, rejected this theory finding that case law requires "actual notice of a current delinquency to establish an affirmative duty to act." The court in *Godfrey* went on to state: "To hold that Godfrey's knowledge of a past delinquency alone makes him a guarantor of future tax payments would be contrary to the logic of the Supreme Court's discussion of willfulness in *Slodov v. United States,* 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251." *Id.,* 748 F.2d at 1578.

The court finds no evidence in the record which establishes plaintiff's personal fault, assuming, *arguendo,* that he could be considered a responsible person. Personal fault is the "epitome of willfulness." *Id.,* 748 F.2d at 1579. There is little support in the record for finding that plaintiff either willfully evaded the payment of taxes or

---

**10.** The court is persuaded that the fact that Mikula attempted to defraud GMC at one time does not make his potential nonpayment of the payroll taxes an obvious and known risk. Mi-

kula's prior exposure at Diamond GMC to the potential penalties surrounding the nonpayment of taxes would seem to give him added inducement to pay the taxes at some point in time.

disregarded an obvious and known risk that the taxes may not be paid.

### III.

Based upon the above discussion the court concludes that plaintiff was not a "responsible person" as defined in 26 U.S.C. § 6671(b) and he did not willfully fail to carry out the duties imposed by 26 U.S.C. § 6672(a). Therefore, the court grants plaintiff's motion for summary judgment and denies defendant's cross-motion for summary judgment. Accordingly, judgment is to be entered for plaintiff for $44.47 plus interest thereon as provided by law with defendant's counterclaim to be dismissed.